E O D   JUL 2 4 2003

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Chapter 7 |
| | ) | |
| VISIONTEK, LLC | ) | Case No. 02 B 47006 |
| | ) | |
| Debtor. | ) | Judge Jack Schmetterer |
| | ) | |
| | ) | |
| JOSEPH E. COHEN, Trustee for the | ) | |
| Estate of VisionTek, LLC, | ) | Case No. 02 CH 19833 |
| | ) | (Removed Case) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RIC LEWIS, ROBERT SHANE VANCE, | ) | Adversary No. 03 A 01698 |
| SCOTT A. HERKELMAN, JOHN R. | ) | |
| MALLEY, JOHN F. HALL, JR., BFG | ) | |
| TECHNOLOGIES, INC., ADVANCED | ) | |
| EQUITIES, INC., KEITH G. DAUBENSPEK, | ) | |
| DWIGHT O. BADGER, CHRISTOPHER R. | ) | |
| PRAVECEK, JOHN SLEVIN, JOHN | ) | |
| VOSICKY, NVIDIA CORP., HILTON | ) | |
| SESSEL, MITAC INTERNATIONAL CORP., | ) | |
| and BARBARA LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Joseph E. Cohen, Trustee (the "Trustee") for the estate of VisionTek, LLC (the "Debtor"), by his attorneys, Richard G. Schultz, Steven H. Gistenson and Richard M. Bendix, for his Amended Complaint against defendants, Ric Lewis, Robert Shane Vance, Scott A. Herkelman, John R. Malley, John F. Hall, Jr., BFG Technologies, Inc., Advanced Equities, Inc., Keith G. Daubenspek, Dwight O. Badger, Christopher R. Pravecek, John Slevin, John Vosicky, Nvidia Corporation, Hilton Sessel, Mitac International Corp. and Barbara Lewis, states as follows:

## GENERAL ALLEGATIONS

### Nature Of The Action

1.      The Debtor was a successful manufacturer and marketer of memory products and products designed to enhance graphics in computer games and personal computers. Beginning in early August 2002, the defendants embarked on a plan pursuant to which the defendants illegally transferred and utilized the Debtor's confidential and proprietary information and trade secrets, and illegally solicited the Debtor's employees, suppliers and customers, for the purpose of creating a new company to compete with and, ultimately, destroy the Debtor.

2.      The defendants' actions constitute: fraudulent transfers that are avoidable pursuant to section 548(a)(1)(B), and recoverable pursuant to section 550(a)(1), of the Bankruptcy Code (11 U.S.C. §101 et seq.) (Count I); copyright infringement under section 501 of the Copyright Act (17 U.S.C. §101 et seq.) (Counts II and III); breach of several employment and confidentiality agreements (Counts IV through XVII); breach of certain defendants' fiduciary duties (Counts XVIII through XIX); violations of the Illinois Trade Secrets Act (765 ILCS 1065/1 et seq.) (Counts XX through XXII); and tortious interference with the Debtor's contractual and business relationships (Counts XXIII through XXVII).

### Jurisdiction And Venue

3.      Jurisdiction is proper in this Court under 28 U.S.C. §1334 as follows:

a.      Count I, fraudulent transfer pursuant to 11 U.S.C. §§548 and 550, is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(H) arising out of the Chapter 7 case of *In the Matter of VisionTek, LLC,* case number 02 B 47006 pending in the United States Bankruptcy Court, Northern District of Illinois, Eastern Division;

b.    Counts II and III, copyright infringement under section 501 of the Copyright Act (17 U.S.C. §101 et seq.), are non-core proceedings pursuant to 28 U.S.C. §157 over which the district court has original and exclusive jurisdiction pursuant to 28 U.S.C. §§1331 and 1338(a) and which are related to the Chapter 7 case of *In the Matter of VisionTek, LLC*, case number 02 B 47006 pending in the United States Bankruptcy Court, Northern District of Illinois, Eastern Division;

c.    Counts IV through XXVII, the state law claims, are non-core proceedings pursuant to 28 U.S.C. §157 over which the district court has jurisdiction because such claims are related to the Chapter 7 case of *In the Matter of VisionTek, LLC*, case number 02 B 47006 pending in the United States Bankruptcy Court, Northern District of Illinois, Eastern Division and because such claims are so related to claims in this action within the district court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution pursuant to 28 U.S.C. §1367(a);

d.    The Trustee does not consent to the entry of final orders or judgment by the bankruptcy judge as to the non-core matters because a jury demand was filed in this case.

4.    Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b) and (c), 1400(a) and 1409(a).

**The Parties**

5.    The Debtor is a Delaware limited liability company.  Its principal place of business was located at 1175 Lakeside Drive, Gurnee, Illinois 60031.

6.    On November 27, 2002, an involuntary bankruptcy petition was filed against the Debtor under Chapter 7 of the Bankruptcy Code.  An order for relief was entered on January 24,

2003. The Trustee was appointed on January 24, 2003. The claims against the defendants asserted in this Amended Complaint are the only substantial asset of the Debtor's estate.

7.    Ric Lewis ("Lewis") is an individual and, upon information and belief, resides at 25194 Abbey Glenn Dr., Hawthorn Woods, in Lake County, Illinois. Lewis is a shareholder of the Debtor, and he was employed by the Debtor.

8.    Robert Shane Vance ("Vance") is an individual and, upon information and belief, resides at 200 Hollow Way, Ingleside, in Lake County, Illinois. Vance was employed by the Debtor.

9.    Scott A. Herkelman ("Herkelman") is an individual and, upon information and belief, resides at 1527 Plum Court, Grayslake, in Lake County, Illinois. Herkelman was employed by the Debtor.

10.    John R. Malley ("Malley") is an individual and, upon information and belief, resides at 59 Seneca West Ave., Hawthorn Woods, in Lake County, Illinois. Malley was employed by the Debtor.

11.    John F. Hall, Jr. ("Hall") is an individual and, upon information and belief, resides at 729 Firth, Mundelein, in Lake County, Illinois. Hall was employed by the Debtor.

12.    BFG Technologies, Inc. ("BFG") is an Illinois corporation and, upon information and belief, its principal place of business is located at 86 Albrecht Dr., Lake Bluff, in Lake County, Illinois.

13.    Advanced Equities, Inc. ("Advanced Equities") is an Indiana corporation registered as a foreign corporation in Illinois and, upon information and belief, its principal place of business is located at 311 South Wacker Drive, Suite 1650, Chicago, in Cook County, Illinois.

14. Keith G. Daubenspek ("Daubenspek") is an individual and, upon information and belief, resides in Cook County, Illinois. Upon information and belief, Daubenspek is an employee of Advanced Equities.

15. Dwight O. Badger ("Badger") is an individual and, upon information and belief, resides in Cook County, Illinois. Upon information and belief, Badger is an employee of Advanced Equities.

16. Christopher R. Pravecek ("Pravecek") is an individual and, upon information and belief, resides in Cook County, Illinois. Upon information and belief, Pravecek is an employee of Advanced Equities, and he is the managing director of corporate finance and general counsel of Advanced Equities.

17. John Slevin ("Slevin") is an individual and, upon information and belief, resides in Cook County, Illinois. Upon information and belief, Slevin is an employee of BFG.

18. John Vosicky ("Vosicky") is an individual and, upon information and belief, resides at 2530 S. Chesapeake Pl., Westchester, in Cook County, Illinois. Upon information and belief, Vosicky is an employee of BFG.

19. Nvidia Corporation ("Nvidia") is a Delaware Corporation and, upon information and belief, its principal place of business is located at 2701 San Tomas Expressway, Santa Clara, California.

20. Hilton Sessel ("Sessel") is an individual and, upon information and belief, resides in Orange Beach, Alabama. Upon information and belief, Sessel is an employee of Nvidia, and he is the director of sales of Nvidia.

21. Mitac International Corp. ("Mitac") is a Taiwan corporation and, upon information and belief, its principal place of business is located in Taiwan. Upon information

and belief, Mitac maintains an office in the United States located at 42001 Christy St., Fremont, California.

22.     Barbara Lewis ("Barbara Lewis") is an individual and, upon information and belief, resides at 25194 Abbey Glenn Dr., Hawthorn Woods, in Lake County, Illinois.

**The Debtor Generally**

23.     The Debtor was founded in 1988, and it grew to be one of the largest manufacturers of 3D computer graphics accelerators and memory modules in North America. It has been engaged in the business of manufacturing, assembling, and selling microelectronic modules, sometimes called "cards," for the enhancement of graphics in computer games and personal computers. The Debtor's retail products, including products in its Xtasy™ product line, have been honored by leading industry magazines, and the Debtor earned and held the number one spot in U.S. retail markets for its graphics products. In 2001, the Debtor's gross revenues were approximately $178,000,000.

24.     Through the years, the Debtor had expended considerable effort and resources to develop unique and proprietary approaches to, and methods for, the development, design, manufacture and sale of products for computer games and personal computers. The Debtor had also expended considerable effort and resources to educate its employees in these unique and proprietary approaches and methods and to prevent these approaches and methods from being disclosed to its competitors.

25.     The Debtor operated in a highly competitive consumer electronics industry where secrecy of confidential information and continuing loyalty and honesty by employees against unauthorized competition are acutely necessary for a business to survive and prosper.

### Lewis' Employment

26.     Lewis became an employee of the Debtor on or about July 13, 1998 as its senior vice president of OEM sales and strategic relations.  Lewis' initial base salary was $200,000 annually, and he was eligible for annual bonuses and stock awards.  In 2000, Lewis received, in addition to base salary, commission and bonus payments of nearly $500,000.  Lewis is a shareholder of the Debtor.

27.     Lewis executed that certain "Employment Agreement" dated May 15, 1998 (the "Lewis Employment Agreement"), a copy of which is attached hereto as **Exhibit 1**.  Paragraphs 8, 9 and 10 of the Lewis Employment Agreement set forth confidentiality, non-competition and non-solicitation obligations on the part of Lewis.

28.     Pursuant to that certain confidentiality agreement dated July 31, 1998 (the "Lewis Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 2**, Lewis agreed to be bound by further confidentiality obligations.

29.     Lewis and the Debtor entered that certain "Separation And Release Agreement" dated October 3, 2001 (the "Lewis Separation Agreement"), a copy of which is attached hereto as **Exhibit 3**.  Pursuant to the Lewis Separation Agreement, Lewis' employment with the Debtor terminated effective October 2, 2001.  Notwithstanding termination of Lewis' employment, the Lewis Separation Agreement provides that "Sections 8, 9 and 10 of the [Lewis] Employment Agreement [pertaining to confidentiality, non-competition and non-solicitation] shall survive the termination of the [Lewis] Employment Agreement as amended by this Agreement."  The Lewis Separation Agreement further expressly extends the duration of the confidentiality, non-competition and non-solicitation obligations as set forth in the Lewis Employment Agreement from 12 months to 18 months of uninterrupted compliance after termination of Lewis'

employment. Pursuant to the Lewis Separation Agreement, the Debtor agreed to pay Lewis the gross amount of $520,000 in regular weekly payroll installments over a period of 24 months, as well as insurance premiums and other expenses.

30.    Lewis and the Debtor entered into that certain consulting agreement dated May 6, 2002 (the "Lewis Consulting Agreement"), a copy of which is attached hereto as **Exhibit 4**. Pursuant to the Lewis Consulting Agreement, Lewis agreed to provide certain services to the Debtor. The Lewis Consulting Agreement also imposed upon Lewis certain confidentiality obligations. The Lewis Consulting Agreement expressly amended the payments provided by the Debtor to Lewis pursuant to the Lewis Separation Agreement, but it otherwise provided that the Lewis Separation Agreement shall be fully enforceable.

31.    On or about August 1, 2002, Lewis' employment with the Debtor was reinstated, and he became the president of the Debtor.

### Vance's Employment

33.    Vance became an employee of the Debtor on or about November 1, 2000 as an account manager. Vance's initial base salary was $70,000 per year plus commission. Vance subsequently became the Debtor's director of sales, then vice president of sales, and then executive vice president of sales and marketing. In 2001, Vance received base salary, commission and bonus payments of over $375,000.

33.    Vance executed that certain "Employment Agreement" dated December 29, 2000 (the "Vance Employment Agreement"), a copy of which is attached hereto as **Exhibit 5**. The Vance Employment Agreement sets forth confidentiality, non-competition and non-solicitation obligations on the part of Vance.

34.    Pursuant to that certain confidentiality agreement dated November 2, 2000 (the "Vance Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 6**, Vance agreed to be bound by further confidentiality obligations.

35.    Vance executed a separate "Confidential Disclosure Agreement" dated January 3, 2002 (the "Vance Confidential Disclosure Agreement"), a copy of which is attached hereto as **Exhibit 7**. The Vance Confidential Disclosure Agreement imposes additional confidentiality obligations upon Vance.

### Herkelman's Employment

36.    Herkelman became an employee of the Debtor on or about April 15, 2002 as its director of business development. Herkelman subsequently became the Debtor's executive vice president of operations and business development.

37.    Herkelman executed that certain "Confidential Disclosure Agreement" dated April 16, 2002 (the "Herkelman Confidential Disclosure Agreement"), a copy of which is attached hereto as **Exhibit 8**. The Herkelman Confidential Disclosure Agreement imposes certain confidentiality obligations upon Herkelman.

### Malley's Employment

38.    Malley became an employee of the Debtor on or about August 14, 2000 as director of marketing.

39.    Malley executed that certain "Employment Agreement" dated July 28, 2000 (the "Malley Employment Agreement"), a copy of which is attached hereto as **Exhibit 9**. The Malley Employment Agreement provides, among other things, that Malley will not make use of any confidential information or trade secrets of the Debtor, and he will not disclose the Debtor's

confidential information or trade secrets to any individual or company without the Debtor's prior written consent.

40.     Pursuant to that certain confidentiality agreement dated August 14, 2000 (the "Malley Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 10**, Malley agreed to be bound by further confidentiality obligations.

41.     Malley executed that certain "Confidential Disclosure Agreement" dated July 3, 2001 (the "Malley Confidential Disclosure Agreement"), a copy of which is attached hereto as **Exhibit 11**. The Malley Confidential Disclosure Agreement imposes additional confidentiality obligations upon Malley.

**Hall's Employment**

42.     Hall became an employee of the Debtor on or about May 3, 2000 as technical support for OEM customers. Hall's initial base salary was $75,000 per year plus commission.

43.     Hall executed that certain "Employment Agreement" dated December 18, 2000 (the "Hall Employment Agreement"), a copy of which is attached hereto as **Exhibit 12**. The Hall Employment Agreement sets forth confidentiality, non-competition and non-solicitation obligations on the part of Hall.

44.     Pursuant to that certain confidentiality agreement dated May 3, 2000 (the "Hall Confidentiality Agreement"), a copy of which is attached hereto as **Exhibit 13**, Hall agreed to be bound by further confidentiality obligations.

**Protection Of Confidential Information**

45.     During their employment with the Debtor, Lewis, Vance, Herkelman, Malley and Hall became key employees in all phases of selling, marketing and distributing the Debtor's products. As key employees, they had access to, and became intimately familiar with, on a daily

basis, the Debtor's confidential information and trade secrets, including operating and financial information relating to the Debtor. Additionally, they became knowledgeable about all of the business plans and strategies of the Debtor.

46.     The Debtor proactively maintained the secrecy of its confidential information by the following practices and procedures:

a.     The Debtor required key employees such as Lewis, Vance, Herkelman, Malley and Hall to sign confidentiality agreements.

b.     The Debtor distributed an employee handbook to each new employee, which addresses confidentiality issues. A confidentiality section admonishes employees not to describe the Debtor's operations with anyone outside the organization except in the normal course of business, and prohibits the disclosure of any business information.

c.     The Debtor required each employee to provide the Debtor's management with a written acknowledgment that the employee has read and understood the confidentiality provisions of the employee manual.

d.     The Debtor limited access of each employee to particular categories of confidential information according to computer security codes provided to the employees.

e.     The Debtor continually admonished and reminded its employees, both orally and in writing, of the Debtor's confidentiality requirements.

f.     The Debtor's confidential information was physically and electronically secured, and the Debtor limited access to such confidential information to only those individuals who required access to such information in the course of performing their duties as employees of the Debtor.

g.    The Debtor employed a secure procedure for discarding confidential information.

**Key Suppliers**

47.    The production of the Debtor's Xtasy™ product line was dependent upon certain key components that the Debtor purchased from key suppliers with which the Debtor had developed business relationships.

48.    One of the Debtor's key suppliers was Nvidia.  Nvidia supplied the graphics processing unit and other key hardware and software components for the graphic boards incorporated into the Debtor's graphics cards.

49.    Mitac was also a key supplier.  Mitac manufactured graphic cards for the Debtor's retail products.

50.    Mitac and the Debtor are parties to that certain "Mutual Confidentiality Agreement" (the "Mitac Confidentiality Agreement") dated February 1, 2002, a copy of which is attached hereto as **Exhibit 14**.  The Mitac Agreement provides in part:

> 3.    **Confidentiality**    Each party agrees that as a condition to Confidential Information being furnished to the other, each party shall hold and maintain all Confidential Information in strict confidence.  Furthermore, each party agrees not to disclose Confidential Information to any company, entity or person without the prior written consent of the other party for a period of three (3) years from the date hereof.

Pursuant to the Mitac Confidentiality Agreement, the Debtor provided Mitac with confidential proprietary information.  This information included, but was not limited to: customer information; financial information; sales forecasts; and purchasing and pricing information relating to raw materials.

**Advanced Equities**

51.    In early 2002, the Debtor embarked on an effort to raise capital.  In or about

February 2002, the Debtor engaged in discussions with Advanced Equities regarding Advanced

Equities securing financing for, or entering into other transactions with, the Debtor.

52.    The Debtor and Advanced Equities entered into that certain "Non-Disclosure

Agreement" (the "Advanced Equities Agreement") effective February 21, 2002, a copy of which

is attached hereto as **Exhibit 15**.  The Advanced Equities Agreement provides in part:

> A.    The Confidential Information is provided for the
> sole purpose of discussing financing or other transactions
> involving [the Debtor] and [Advanced Equities] (the "Business
> Purpose").   [Advanced Equities] shall not copy, reproduce,
> disclose, publish or disseminate any Confidential Information to
> anyone other than its employees and/or legal and financial advisors
> (under a duty of confidentiality no less restrictive than the terms
> hereof whether by pre-existing agreement or relationship) who
> need to know for the Business Purpose, and [Advanced Equities]
> shall use at least the same degree of care used by it to protect the
> unauthorized use, disclosure, publications or dissemination or its
> own Confidential Information, but in any case no less than a
> reasonable degree of care.

The Advanced Equities Agreement provides further:

> B.    [Advanced Equities] accepts the Confidential Information
> for the Business Purpose and in connection with the discussions
> hereunder.   Other than for the Business Purpose, [Advanced
> Equities] shall not use Confidential Information for its own or any
> third party's benefit.  ***

53.    Advanced Equities secured financing for the Debtor in the amount of $4,575,000.

Of this amount, $407,730 was paid as a fee to Advanced Equities.  Upon information and belief,

Slevin was one of the investors who contributed funds for a portion of this financing.

54.    In or about July 2002, Advanced Equities and the Debtor discussed the possibility

of raising additional funds in connection with the purchase of some or all of the Debtor's issued

and outstanding shares of capital stock.  Advanced Equities proposed a transaction pursuant to

which, among other things, Slevin would become the chairman of the board and an executive officer of the surviving company; Vosicky would become its chief financial officer; and all of the Debtor's key employees would remain with the surviving company.

55.    In furtherance of this proposal, and pursuant to the terms of the Advanced Equities Agreement, Advanced Equities and Vosicky conducted extensive due diligence. As a part of this due diligence, the Debtor provided Advanced Equities, Pravecek and Vosicky with the Debtor's confidential financial statements as well as information regarding the Debtor's business operations, business opportunities and trade secrets. This information included data concerning the Debtor's overhead, costs, volume, pricing, margins, purchases, sales, forecasts, financial projections and organizational charts. Advanced Equities, Pravecek and Vosicky were also provided information concerning the Debtor's relationships with its employees, suppliers and customers. In other words, Advanced Equities, Pravecek and Vosicky were provided with a complete business plan and model.

56.    Advanced Equities, Pravecek and Vosicky were advised, orally and in writing, of employment agreements, confidentiality agreements and similar agreements between the Debtor and its employees. All of the defendants were otherwise aware of the employment agreements, confidentiality agreements and similar agreements between the Debtor and its employees.

57.    In July and August 2002, Advanced Equities and the Debtor exchanged several term sheets outlining a transaction consisting of the sale of some or all of the Debtor's issued and outstanding shares of capital stock to Advanced Equities and/or a related entity.

**The Defendant's Illegal Plan**

58.    On August 5, 2002, representatives of the Debtor (including Lewis, Vance and Herkelman) met with representatives of Advanced Equities (Daubenspek, Badger and Pravecek),

Slevin and Vosicky. The purpose of this meeting was to discuss issues concerning Advanced Equities' purchase of the Debtor. At this meeting, Herkelman asserted that, in order for the purchase to go ahead, certain demands by Lewis, Vance and Herkelman must first be agreed upon by Advanced Equities. These demands included that each of Lewis, Vance and Herkelman must receive: a seat on the board of directors of the surviving company; an annual salary of $200,000; a payment by the surviving company in the amount of $50,000 upon closing a transaction; and a payment of $50,000 from certain officers of the Debtor. Herkelman further demanded that he, Lewis and Vance receive a 45 percent ownership interest in the surviving company. Herkelman stated that if these demands were not agreed upon by 6:00 p.m., he, Lewis and Vance would leave the Debtor. Lewis', Vance's and Herkelman's demands were rejected.

59.     Upon information and belief, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities secretly contacted, and met with, Lewis, Vance, Herkelman, and possibly other employees of the Debtor, on one or more occasions beginning in early August 2002. During the course of these secret meetings, Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, agreed upon a plan pursuant to which Advanced Equities would delay and/or terminate negotiations with the Debtor, and a new company would be created to include as employees Lewis, Vance and Herkelman.

60.     On information and belief, Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, reviewed and utilized the Debtor's confidential information transferred and obtained pursuant to the Advanced Equities Agreement and transferred and obtained from Lewis, Vance, Herkelman, Malley, Hall, and possibly others, to analyze and evaluate the feasibility of creating a new company separate from the Debtor. The confidential information transferred and obtained included the Debtor's

overhead, costs, volume, pricing, margins, purchases, sales, forecasts, financial projections and organizational charts, as well as information concerning the Debtor's employee, supplier and customer relationships.

61.    On information and belief, the purpose of the plan secretly devised by Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, was to position a new company to cripple the Debtor and take over the Debtor's business. Pursuant to this plan, the new company would utilize the confidential information transferred to, and obtained by, Advanced Equities, Pravecek and Vosicky from the Debtor pursuant to the Advanced Equities Agreement, as well as confidential information transferred to, and obtained by, employees of the Debtor, including Lewis, Vance, Herkelman, Malley and Hall, to immediately establish a new, fully-functioning company and solicit the Debtor's employees, suppliers and customers to work with the new company and terminate their relationships with the Debtor.

62.    On information and belief, the plan was contingent upon Lewis, Vance and Herkelman successfully convincing certain of the Debtor's other employees, the Debtor's key suppliers, Nvidia and Mitac, and the Debtor's key customers, including Best Buy, to: cooperate with the plan; support the new company that would be created by Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others; and to cease their business relationships with the Debtor.

63.    Lewis, Vance and Herkelman admitted that Slevin disclosed this plan in at least one of their conversations with him. According to Lewis, Vance and Herkelman, on August 5, 2002, after the meeting described in paragraph 58 above, Slevin told Lewis, Vance and Herkelman to abandon the Debtor; and Slevin stated that he, Vosicky, Advanced Equities,

Daubenspek, Badger and Pravecek would create a new company which would employ and work directly with Lewis, Vance and Herkelman.

64.    On information and belief, Nvidia, through its director of sales, Sessel, and Mitac met, and/or otherwise discussed, with Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, or some of them, and agreed to cooperate with the plan, support the new company and cease their business relationships with the Debtor. Nvidia's and Mitac's cooperation with the plan was critical to Lewis', Vance's and Herkelman's participation with the plan and agreement to leave the Debtor; and the plan could not proceed without Nvidia's and Mitac's support and participation.

65.    Upon information and belief, during these meetings and/or discussions and in furtherance of this plan, Mitac transferred the Debtor's confidential information to Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, or some of them, obtained by Mitac pursuant to the Mitac Confidentiality Agreement. In addition, in furtherance of this plan, Nvidia, through Sessel, agreed to, and did, advise one or more individuals and/or entities with which the Debtor was conducting, or had an expectation of conducting, business, that the Debtor did not have the legal right to sell the Debtor's inventory. Nvidia, through Sessel, threatened to hold such individuals and/or entities liable should they do business with the Debtor.

66.    Lewis, Vance, and Herkelman jointly participated in a conference call with Anson Chen ("Chen"), Mitac's liaison officer with the Debtor, during the week of August 5 through 9, 2002. Upon information and belief, the purpose of the conference call was to discuss the plan of Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, to form their own company to compete with, and destroy, the Debtor, and to

line up Mitac as a supplier to the new company. During this conversation, Lewis, Vance and Herkelman discussed with Chen scheduling a meeting with Mitac in Taiwan.

67.    In furtherance of this plan, Lewis caused a copy of the Debtor's organizational chart to be transferred to Chen in order to identify the Debtor's employees who may be a part of the new company. The organizational chart transferred to Chen reflects a change made by Lewis upon becoming president of the Debtor, appointing Herkelman as the primary contact with Mitac.

68.    Upon information and belief, between August 5, 2002 and thereafter, additional discussions occurred between Lewis, Vance, Herkelman, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities regarding: the creation of a new company by them for the purpose of appropriating the Debtor's business; utilizing the confidential information transferred to them, including the Debtor's business model that Advanced Equities, Pravecek and Vosicky had obtained from the Debtor pursuant to the Advanced Equities Agreement; and utilizing the Debtor's employee, supplier and customer relationships, all for their own personal benefit and to the detriment of the Debtor.

69.    On August 14, 2002, Lewis, Vance and Herkelman abruptly submitted their resignations from the Debtor, effective immediately.

70.    The defendants engaged in a campaign to publicly sabotage, disparage and destroy the Debtor. Among other things, on information and belief, Vance and/or Malley placed, or caused to be placed, false and/or misleading information, and confidential information, about the Debtor in industry publications. The publication of this information caused irreparable damage to the Debtor's reputation and ability to conduct business.

71.     On August 14, 2002, while Lewis, Vance and Herkelman were still employed by the Debtor, Mitac, upon information and belief, at the request of Lewis, Vance and Herkelman and possibly others, requested that Nvidia hold and/or cancel all open orders placed by the Debtor. This action caused irreparable damage to the Debtor's reputation and ability to conduct business.

72.     On August 14, 2002, while Lewis, Vance and Herkelman were still employed by the Debtor, reservations were made for Lewis, Vance, Herkelman and Slevin to travel to Atlanta to meet with Sessel of Nvidia. Upon information and belief, the purpose of this meeting was to discuss the plan of Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, to form their own company to compete with, and destroy, the Debtor, and to confirm Nvidia as a supplier to the new company.

73.     On or about August 13, 2002, one day before his resignation and while still employed by the Debtor, Herkelman wrote to Chen at Mitac regarding the meeting with Mitac in Taiwan. Herkelman wrote that "[t]he trip will definitely be made sometime between now and September 15, 2002. Herkelman's e-mail, and the planned trip to Taiwan was, upon information and belief, in furtherance of the plan secretly devised by Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others, to form their own company to compete with, and destroy, the Debtor, and to confirm Nvidia as a supplier to the new company. On August 27, 2002, Herkelman and Vosicky traveled to Taiwan to meet with Mitac to discuss supplying their new company.

74.     Prior to resigning their employment with the Debtor, Lewis, Vance and Herkelman, on the basis of their position with the Debtor, were given access to all of the Debtor's confidential financial information, including the Debtor's financial projections. Lewis,

Vance and Herkelman also requested, and were provided with, information concerning legal proceedings in which the Debtor was involved. Between August 5, 2002 and August 14, 2002, Lewis, Vance and Herkelman specifically requested that the Debtor's chief financial officer explain the Debtor's confidential financial information and operations. During this same period, Vance specifically requested, and he was provided with, copies of the Debtor's confidential customer agreements relating to pricing and payment terms and operational requirements.

75.     Prior to resigning their employment with the Debtor, Lewis, Vance and Herkelman, upon information and belief, told Mitac to, and Mitac agreed to, create excess inventory, beyond the Debtor's requirements, for the purpose of providing an inventory supply for the new company to be formed by Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, and possibly others.

76.     Prior to leaving the Debtor's offices on August 14, 2002, Lewis, Vance and Herkelman downloaded and transferred the Debtor's computer files; and, when they left the Debtor, they took the Debtor's lap-top computers and personal digital devices with them. The files downloaded and transferred included, on information and belief: the Debtor's confidential information concerning the Debtor's suppliers, customers and press contacts. In addition, Lewis, Vance and Herkelman removed and transferred from the Debtor copies of the Debtor's confidential financial information including the Debtor's financial projections.

77.     Sometime prior to, and continuing after, their resignations from the Debtor, Lewis, Vance and Herkelman, in concert with Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities, began to develop, organize and implement their business plan for a new company, based on the business model transferred from the Debtor to these defendants, for the purpose of appropriating and destroying the Debtor's business. Among other things, some or all

of the defendants: developed artwork and packaging for products that would compete with the Debtor's Xtasy™ product line; reviewed and analyzed confidential financial statements, financial projections, business operations, business opportunities and trade secrets transferred from the Debtor to the defendants; and solicited the Debtor's employees, suppliers and customers.

78.     On or about August 27, 2002, Herkelman incorporated BFG.

79.     Lewis, Vance, Herkelman, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities, directly or indirectly, solicited Malley to leave his employment with the Debtor.  On August 23, 2002, Malley submitted his resignation from the Debtor.  Malley is currently an employee of BFG.  Upon leaving the Debtor, Malley took his lap-top computer, containing the Debtor's confidential information, with him.

80.     Lewis, Vance, Herkelman, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities, directly and/or indirectly, solicited Hall to leave his employment with the Debtor.  On August 23, 2002, Hall submitted his resignation from the Debtor.  Hall is currently an employee of BFG.

81.     Lewis, Vance, Herkelman, Malley, Hall, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities, directly and/or indirectly, solicited other employees of the Debtor to leave the Debtor and accept employment with BFG.  Among other things, Lewis had his wife, Barbara Lewis, contact the Debtor's employees to solicit them to leave the Debtor and to accept employment with BFG.  Barbara Lewis was aware all of the individuals she contacted were employees of the Debtor and that some or all of them were the subject of the Debtor's employment Agreements.  The employees who were solicited include: Rich A. Espineli; Lissette

Fernandez; Edward J. Gourley; Jeffrey S. Hoeft; Michael Innes; Steve Jachim; Anna M. Keller; Eric R. Nally; and Holly G. Rodgers.

82.    Lewis, Vance, Herkelman, Malley, Hall, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities, directly and/or indirectly, solicited suppliers of the Debtor to stop doing business with the Debtor and to do business with BFG.  The suppliers that were solicited include: Mitac; Nvidia; Zomax; and Steven Gould Company.

83.    Lewis, Vance, Herkelman, Malley, Hall, Slevin, Vosicky, Daubenspek, Badger, Pravecek and Advanced Equities, directly or indirectly, solicited customers of the Debtor and manufacturer representatives to stop doing business with the Debtor and to do business with BFG.  The customers that were solicited include: Best Buy, Comp USA, WalMart and D and H Distributing.  The manufacturer representatives that were solicited include: Compass Marketing and Integra Marketing.

84.    In a letter dated August 27, 2002, a copy of which is attached hereto as **Exhibit 16**, Pravecek wrote to Equity Partners, Inc., a representative of the Debtor, and offered, on behalf of an undisclosed "group", to purchase "all brand names, trade names, trademarks and exclusive rights to all intellectual property of" the Debtor.  Pravecek stated further that it is this group's "desire to compete in graphics card space that [the Debtor] previously occupied and, accordingly, they would like to hire two former employees of [the Debtor] who are currently subject to non-compete agreements."  On information and belief, the group on whose behalf Pravecek wrote the August 27, 2002 correspondence consists of Slevin, Vosicky, Daubenspek, Badger, Pravecek, Advanced Equities, Lewis, Vance, Herkelman, BFG and possibly others. Pravecek later resubmitted this same offer to another representative of the Debtor.  Both offers were rejected.

**FRAUDULENT TRANSFERS**

## COUNT I

(Fraudulent Transfers Against Lewis, Vance, Herkelman, Malley, Hall, Advanced Equities, BFG, Daubenspek, Badger, Pravecek, Slevin and Vosicky)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count I.

85.    Section 548(a) of the Bankruptcy Code provides in pertinent part:

> (a)(1)  The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> *  *  *
>
> (B)(i)  received less than a reasonably equivalent value in exchange for such transfer ...; and
>
> (ii)(I)  was insolvent on the date that such transfer was made ..., or became insolvent as a result of such transfer or obligation.
>
> *  *  *

86.    Section 101(54) of the Bankruptcy Code defines the term "transfer" in pertinent part as follows:

> (54)  "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property ... .

87.    As an integral part of the defendant's illegal plan to position a new company, BFG, to cripple the Debtor and take over the Debtor's business, Lewis, Vance, Herkelman, Malley, Hall, Advanced Equities, Daubenspek, Badger, Pravecek, Slevin and Vosicky obtained, and fraudulently transferred to BFG, the Debtor's confidential information and trade secrets, including information relating to the Debtor's overhead, costs, volume, pricing, margins,

purchases, sales, agreements, models, plans, forecasts, financial projections and organizational charts, as well as information concerning the Debtor's employee, supplier and customer relationships.

88.     Lewis, Vance, Herkelman, Malley, Hall, Advanced Equities, BFG, Daubenspek, Badger, Pravecek, Slevin and Vosicky appropriated the Debtor's confidential information and trade secrets to immediately establish a new, fully-functioning company, BFG, and to solicit the Debtor's employees, suppliers and customers to work with BFG and to terminate their relationships with the Debtor.

89.     The Debtor received no value in exchange for the foregoing transfers.

90.     The Debtor became insolvent as a result of such transfers.

91.     The appropriations of the Debtor's confidential information and trade secrets are fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

92.     Section 550(a)(1) of the Bankruptcy Code authorizes the Trustee to recover, for the benefit of the Estate, from the initial transferees of such transfers or the entity for whose benefit such transfers were made, any property, or the value of such property, fraudulently transferred in violation of section 548 of the Bankruptcy Code.

93.     The foregoing transfers were made within one year before the date of filing the petition commencing the Debtor's case.

WHEREFORE, the Trustee prays for judgment in his favor and against Lewis, Vance, Herkelman, Malley, Hall, Advanced Equities, BFG, Daubenspek, Badger, Pravecek, Slevin and Vosicky as follows:

a.     awarding to the Trustee the value of the property fraudulently transferred from the Debtor in an amount to be determined at trial, plus his costs;

b.      awarding to the Trustee his costs; and

c.      awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COPYRIGHT INFRINGEMENT

### COUNT II

(Copyright Infringement Against BFG – FAQ's)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count II.

85.    The Debtor is the owner of the non-dramatic literary work called "VisionTek FAQ's" ("FAQ's") which the Debtor produced in or around June of 2002.

86.    The FAQ's is a list of frequently asked questions with the corresponding responses compiled by the Debtor regarding its software to help its consumers understand, use and troubleshoot the Debtor's product.

87.    In compliance with the copyright laws of the United States, the Debtor registered its FAQ's with the United States Copyright Office on November 15, 2002.  A true and correct copy of Certificate of Registration No. TX 5-505-153 is attached as **Exhibit 17.**

88.    Commencing in or around late August 2002, and continuing to the present time, BFG has infringed the Debtor's copyright in its FAQ's by reproducing, displaying, modifying or transmitting, in the United States, FAQ's, whose text is substantially similar to the Debtor's FAQ's.  A true and correct copy of BFG's infringing FAQ's is attached hereto as **Exhibit 18.**

89.    BFG is familiar with the Debtor's FAQ's.  Certain of BFG's employees were previously employees of the Debtor, including Lewis, Vance, Herkelman, Malley and Hall.

90.    BFG had access to the Debtor's FAQ's. The Debtor's FAQ's were posted on the Debtor's website, to which BFG had access.

91.    On December 13, 2002, the Debtor served a demand in writing upon BFG, insisting that BFG cease and desist from reproducing, displaying, modifying or transmitting the Debtor's FAQ's. BFG has failed and refused to comply with the Debtor's demand.

92.    BFG's actions constitute copyright infringement in violation of section 501 of the Copyright Act (17 U.S.C. §501).

93.    By reason of BFG's infringement of the Debtor's FAQs, the Debtor has been damaged in the amount of any profits BFG has received attributable to BFG's infringement.

WHEREFORE, the Trustee prays for judgment in his favor and against BFG as follows:

a.    ordering that BFG has willfully infringed upon the Debtor's copyright with respect to the Debtor's FAQ's;

b.    ordering that BFG provide a full and complete accounting of all gains, profits and advantages it has derived from said infringement;

c.    awarding to the Trustee BFG's gross profits attributable to its infringement of the Debtor's copyright with respect to the Debtor's FAQ's;

d.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT III

(Copyright Infringement Against BFG – Installation Instructions)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count III.

85.    The Debtor is the owner of the non-dramatic literary work called "VisionTck Installation Instructions" ("Installation Instructions") which it produced prior to June of 2002.

86.    The Installation Instructions are included in a user manual and are available to consumers, both in hard copy form (physically on paper) and in electronic form, to assist consumers in installing the memory products manufactured by the Debtor.

87.    In compliance with the copyright laws of the United States, the Debtor registered the Installation Instructions with the United States Copyright Office on November 15, 2002. A true and correct copy of Certificate of Registration No. TX 5-505-154 is attached as **Exhibit 19**.

88.    Commencing in or around late August of 2002, and continuing to the present time, BFG has infringed the Debtor's copyright in its Installation Instructions by reproducing, displaying, modifying or transmitting, in the United States, installation instructions, whose text is substantially similar to the Debtor's Installation Instructions. A true and correct copy of BFG'S infringing installation instructions are attached hereto as **Exhibit 20**. BFG packages and distributes its installation instructions both in hard copy form and in electronic form.

89.    BFG is familiar with the Debtor's Installation Instructions. Certain of BFG's employees were previously employees of the Debtor, including Lewis, Vance, Herkelman, Malley and Hall.

90.    BFG had access to Debtor's Installation Instructions. The Debtor's Installation Instructions were posted on the Debtor's website, to which BFG had access.

91.    On December 13, 2002, the Debtor served a demand in writing upon BFG, insisting that BFG cease and desist from reproducing, displaying, modifying or transmitting the Debtor's Installation Instructions. BFG has failed and refused to comply with the Debtor's demand.

92.    BFG's actions constitute copyright infringement in violation of section 501 of the Copyright Act (17 U.S.C. §501).

93.    By reason of BFG's infringement of the Debtor's Installation Instructions, the Debtor has been damaged in the amount of any profits BFG has received attributable to BFG's infringement.

WHEREFORE, the Trustee prays for judgment in his favor and against BFG as follows:

a.    ordering that BFG has willfully infringed upon the Debtor's copyright with respect to the Debtor's Installation Instructions;

b.    ordering that BFG provide a full and complete accounting of all gains, profits and advantages it has derived from said infringement;

c.    awarding to the Trustee BFG's gross profits attributable to its infringement of the Debtor's copyright with respect to the Debtor's Installation Instructions;

d.    awarding to the Trustee his costs; and

e.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## BREACH OF EMPLOYMENT AGREEMENTS

## COUNT IV

### (Breach of Employment Agreement Against Lewis)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count IV.

85.    In paragraph 8 of the Lewis Employment Agreement (**Exhibit 1**), Lewis agreed that: he holds a senior position with the Debtor; he has access to confidential information and trade secrets of the Debtor, its customers, suppliers and affiliates; the confidential information constitutes a unique and valuable asset of the Debtor; maintenance of the proprietary character of

- 28 -

such information is important to the Debtor; the confidential information is sufficiently secret as to derive economic value from not being generally known to others who could obtain economic value from its disclosure or use; and the confidential information is the subject of efforts to maintain its secrecy or confidentiality.

86.    In paragraph 8 of the Lewis Employment Agreement, Lewis agreed to: hold the Debtor's confidential information in the strictest confidence and not to use or disclose the confidential information without the written authorization of the Debtor; take all appropriate steps to safeguard and protect the Debtor's confidential information; and return the confidential information to the Debtor upon termination of his employment.

87.    In paragraph 9.1 of the Lewis Employment Agreement, Lewis agreed that during his employment with the Debtor, and for a period of 12 months thereafter, he will not, directly or indirectly, by or for himself or as the agent of another, or through others as his agent: promote, sell, lease, license, distribute, install or service anywhere in the United States (the "Territory") products or processes in existence or under development, which are similar to or in competition with those of the Debtor; own, manage, operate, be compensated by, participate in, render advice to, have any right to or interest in any other business directly or indirectly engaged in the design, production, sale or distribution of products competitive with those of the Debtor anywhere in the Territory; divulge, communicate, use or disclose any nonpublic information concerning the Debtor, its personnel business and affairs; and interfere with the business relationships or disparage the good name or reputation of the Debtor or take any action which brings the Debtor or its business into public ridicule or disrepute.

88.    In paragraph 9.2 of the Lewis Employment Agreement, Lewis agreed that during his employment with the Debtor, and for a period of 12 months thereafter, he will not, directly or

indirectly, by or for himself or as the agent of another, or through others as his agent: solicit or accept any business from customers or suppliers of the Debtor, or request, induce or advise customers or suppliers of the Debtor to withdraw, curtail or cancel their business with the Debtor; solicit for employment or employ or become employed by any past, present or future employee of the Debtor, or request, induce or advise any employee to leave the employ of the Debtor; and use or disclose the names and/or addresses of any customer, supplier or employee of the Debtor to any person for any purposes whatsoever.

89.    In paragraph 9.3 of the Lewis Employment Agreement, Lewis agreed that each restrictive covenant shall be deemed to have the duration specified in paragraphs 9.1 and 9.2 of the Lewis Employment Agreement, computed from the date relief from any violation of those provisions is granted.

90.    In paragraph 9.4 of the Lewis Employment Agreement, Lewis agreed that the Debtor shall be entitled to an accounting and repayment of all profits, compensation, commission, remuneration or other benefits that Lewis, directly or indirectly, may realize arising from or related to any such violation of the Lewis Employment Agreement. He further agreed that these remedies shall be in addition to, and not in limitation of, any injunctive relief or other rights to which the Debtor may be entitled.

91.    Pursuant to paragraph 1 of the Lewis Separation Agreement (**Exhibit 3**), Lewis' employment by the Debtor terminated as of October 2, 2001. The Lewis Separation Agreement expressly provides that paragraphs 8, 9 and 10 of the Lewis Employment Agreement shall survive the termination of the Lewis Employment Agreement as amended by the Lewis Separation Agreement.

92.    Pursuant to paragraph 6 of the Lewis Separation Agreement, Lewis' restrictive covenants set forth in paragraph 9 of the Lewis Employment Agreement were extended by six months such that Lewis is bound by the provisions of paragraph 9 of the Lewis Employment Agreement for eighteen months of uninterrupted compliance. Lewis further agreed that, in the event that he breaches the surviving provisions of the Lewis Employment Agreement, or the provisions of the Lewis Separation Agreement relating thereto, Lewis shall forfeit all stock ownership in the Debtor, and Lewis shall repay any consideration paid or granted by the Debtor pursuant to the Lewis Separation Agreement.

93.    As described in detail above, Lewis has, directly or indirectly, by or for himself or as the agent of another, or through others as his agent: taken, used and disseminated the Debtor's confidential information without the written authorization of the Debtor; and he failed to return to the Debtor such confidential information. Accordingly, Lewis has breached paragraph 8 of the Lewis Employment Agreement.

94.    As described in detail above, Lewis has, directly or indirectly, by or for himself or as the agent of another, or through others as his agent: promoted, sold and/or distributed in the Territory products and/or processes in existence or under development, which are similar to or in competition with those of the Debtor; owned, managed, operated, been compensated by, participated in, rendered advice to, had a right to or interest in an other business directly or indirectly engaged in the design, production, sale or distribution of products competitive with those of the Debtor in the Territory; divulged, communicated, used and disclosed nonpublic information concerning the Debtor, its personnel business and affairs; and interfered with the business relationships and disparaged the good name and reputation of the Debtor and taken

action which brings the Debtor and its business into public ridicule or disrepute. Accordingly, Lewis has breached paragraph 9.1 of the Lewis Employment Agreement.

95.    As described in detail above, Lewis has, directly or indirectly, by or for himself or as the agent of another, or through others as his agent: solicited, and accepted business from, customers and suppliers of the Debtor; solicited for employment, employed, or become employed by a past employee of the Debtor; and used and/or disclosed the names and/or addresses of the Debtor's customers, suppliers and employees. Accordingly, Lewis has breached paragraph 9.2 of the Lewis Employment Agreement.

96.    The Debtor has fully performed its obligations under the Lewis Employment Agreement.

97.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

98.    Pursuant to paragraph 20 of the Lewis Employment Agreement, the Trustee is entitled to recover his attorneys' fees and court costs.

WHEREFORE, the Trustee prays for judgment in his favor and against Lewis as follows:

a.    ordering that Lewis provide a full and complete accounting and repayment of all profits, compensation, commissions, remuneration or other benefits that Lewis, directly or indirectly realized, or may in the future realize, arising from his breach of the Lewis Employment Agreement;

b.    awarding to the Trustee damages in a sum in excess of $50,000,000;

c.    awarding to the Trustee his costs; and

d.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT V

(Breach of Employment Agreement Against Vance)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count V.

85.    In paragraph 7 of the Vance Employment Agreement (**Exhibit 5**), Vance agreed that: during the course of his employment with the Debtor, he may acquire or come in contact with confidential information and trade secrets belonging to the Debtor which are the subject of efforts by the Debtor to maintain the secrecy and confidentiality of such information and trade secrets.

86.    In paragraph 7 of the Vance Employment Agreement, Vance agreed to: not disclose such confidential information and trade secrets to any company or person without the prior written consent of the Debtor; not make any use whatsoever of such confidential information and trade secrets, except to the extent required in order to carry out his duties as an employee of the Debtor; and not make any use whatsoever of the confidential information and trade secrets which he will remember.

87.    In paragraphs 8(a) and (b) of the Vance Employment Agreement, Vance agreed that while employed by the Debtor, and for a period of six months following termination of his employment, he shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, or in any other capacity: engage in or own, or have any interest in, any business that engages in computer memory brokerage or manufacturing within the United States; and manage, operate, be employed by or consult for any business that engages in computer memory brokerage or manufacturing within the United States.

88.    In paragraphs 8(c) and (d) of the Vance Employment Agreement, Vance agreed that while employed by the Debtor, and for a period of six months following termination of his

employment, he shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, or in any other capacity: solicit for employment or employ or become employed by any person, then, or within the prior six months, employed by the Debtor; and influence or advise any competitor or anyone intending to compete with the Debtor or any subsidiary of the Debtor to employ or otherwise engage the services of any person who is or shall be employed by or in the service of the Debtor or any subsidiary of the Debtor.

89. In paragraphs 8(e), (f), (g) and (h) of the Vance Employment Agreement, Vance agreed that while employed by the Debtor, and for a period of six months following termination of his employment, he shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, or in any other capacity: solicit any business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor or any subsidiary of the Debtor or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor; solicit any business from any customer to whom Vance sold, or who Vance solicited, communicated with, or serviced on behalf of the Debtor during the last six months of his employment with the Debtor pertaining to the brokerage or manufacture of computer memory or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor; accept any business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor or any subsidiary of the Debtor or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor; and accept any business

pertaining to the brokerage or manufacture of computer memory from customers of the Debtor or any subsidiary of the Debtor or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor, where Vance had contact with the customer during the six months prior to his termination date.

90.    In paragraph 8 of the Vance Employment Agreement, Vance agreed that the six month restriction against selling, soliciting or competing imposed pursuant to the Vance Employment Agreement shall be extended and shall not expire until six uninterrupted months after Vance permanently ceases to be in breach of the Vance Employment Agreement.

91.    As described in detail above, Vance has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: disclosed the Debtor's confidential information and trade secrets without the prior written consent of the Debtor; made improper use of such confidential information and trade secrets; and made use of the confidential information and trade secrets he remembers. Accordingly, Vance has breached paragraph 7 of the Vance Employment Agreement.

92.    As described in detail above, Vance has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: engaged in or owned, or had an interest in, a business that engages in computer memory brokerage or manufacturing within the United States; and managed, operated, was employed by or consulted with a business that engages in computer memory brokerage or manufacturing in the United States. Accordingly, Vance has breached paragraphs 8(a) and (b) of the Vance Employment Agreement.

93.    As described in detail above, Vance has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: solicited for employment or employed, or became employed by, a person who was employed by the Debtor; and influenced and advised a competitor and a party intending to compete with the Debtor to employ or otherwise engage the services of a person who was employed by the Debtor. Accordingly, Vance has breached paragraphs 8(c) and (d) of the Vance Employment Agreement.

94.    As described in detail above, Vance has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: solicited business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor and requested, induced and advised customers of the Debtor to withdraw, curtail and cancel their business with the Debtor; solicited business from a customer to whom Vance sold, or who Vance solicited, communicated with, or serviced on behalf of the Debtor during the last six months of his employment with the Debtor pertaining to the brokerage or manufacture of computer memory and requested, induced and advised customers of the Debtor to withdraw, curtail or cancel their business with the Debtor; accepted business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor and requested, induced and advised customers of the Debtor to withdraw, curtail or cancel their business with the Debtor; and accepted business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor and requested, induced and advised customers of the Debtor to withdraw, curtail or cancel their business with the Debtor, where Vance had contact with the customer during the six months prior to his termination date. Accordingly, Vance has breached paragraphs 8(e), (f), (g) and (h) of the Vance Employment Agreement.

95.    The Debtor has fully performed its obligations under the Vance Employment Agreement.

96.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Vance as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT VI

(Breach of Employment Agreement Against Malley)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count VI.

85.    In the Malley Employment Agreement (**Exhibit 9**), Malley agreed that he will not disclose confidential information or trade secrets pertaining to the Debtor to any individual or company without the prior written consent of the Debtor. Malley agreed further that he will not make use of any confidential information or trade secrets of the Debtor.

86.    As described in detail above, Malley has disclosed the Debtor's confidential information and trade secrets to others without the prior written consent of the Debtor, and he has made use of such confidential information and trade secrets for his own, and others', benefit. Accordingly, Malley has breached the Malley Employment Agreement.

87.    The Debtor has fully performed its obligations under the Malley Employment Agreement.

88.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Malley as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT VII

(Breach of Employment Agreement Against Hall)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count VII.

85.    In paragraph 7 of the Hall Employment Agreement (**Exhibit 12**), Hall agreed that: during the course of his employment with the Debtor, he may acquire or come in contact with confidential information and trade secrets belonging to the Debtor which are the subject of efforts by the Debtor to maintain the secrecy and confidentiality of such information and trade secrets.

86.    In paragraph 7 of the Hall Employment Agreement, Hall agreed to: not disclose such confidential information and trade secrets to any company or person without the prior written consent of the Debtor; not make any use whatsoever of such confidential information and trade secrets, except to the extent required in order to carry out his duties as an employee of the Debtor; and not make any use whatsoever of the confidential information and trade secrets which he will remember.

87.     In paragraphs 8(a) and (b) of the Hall Employment Agreement, Hall agreed that while employed by the Debtor, and for a period of six months following termination of his employment, he shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, or in any other capacity: engage in or own, or have any interest in, any business that engages in computer memory brokerage or manufacturing within the United States; and manage, operate, be employed by or consult for any business that engages in computer memory brokerage or manufacturing within the United States.

88.     In paragraphs 8(c) and (d) of the Hall Employment Agreement, Hall agreed that while employed by the Debtor, and for a period of six months following termination of his employment, he shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, or in any other capacity: solicit for employment or employ or become employed by any person, then, or within the prior six months, employed by the Debtor; and influence or advise any competitor or anyone intending to compete with the Debtor or any subsidiary of the Debtor to employ or otherwise engage the services of any person who is or shall be employed by or in the service of the Debtor or any subsidiary of the Debtor.

89.     In paragraphs 8(e), (f), (g) and (h) of the Hall Employment Agreement, Hall agreed that while employed by the Debtor, and for a period of six months following termination of his employment, he shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, or in any other capacity: solicit any business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor or any subsidiary of the Debtor or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with

the Debtor or any subsidiary of the Debtor; solicit any business from any customer to whom Hall sold, or who Hall solicited, communicated with, or serviced on behalf of the Debtor during the last six months of his employment with the Debtor pertaining to the brokerage or manufacture of computer memory or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor; accept any business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor or any subsidiary of the Debtor or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor; and accept any business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor or any subsidiary of the Debtor or request, induce or advise customers of the Debtor or any subsidiary of the Debtor to withdraw, curtail or cancel their business with the Debtor or any subsidiary of the Debtor, where Hall had contact with the customer during the six months prior to his termination date.

90.    In paragraph 8 of the Hall Employment Agreement, Hall agreed that the six month restriction against selling, soliciting or competing imposed pursuant to the Hall Employment Agreement shall be extended and shall not expire until six uninterrupted months after Hall permanently ceases to be in breach of the Hall Employment Agreement.

91.    As described in detail above, Hall has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: disclosed the Debtor's confidential information and trade secrets without the prior written consent of the Debtor; made improper use of such confidential information and trade

secrets; and made use of the confidential information and trade secrets he remembers. Accordingly, Hall has breached paragraph 7 of the Hall Employment Agreement.

92.    As described in detail above, Hall has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: engaged in or owned, or had an interest in, a business that engages in computer memory brokerage or manufacturing within the United States; and managed, operated, was employed by or consulted with a business that engages in computer memory brokerage or manufacturing in the United States.  Accordingly, Hall has breached paragraphs 8(a) and (b) of the Hall Employment Agreement.

93.    As described in detail above, Hall has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: solicited for employment or employed, or became employed by, a person who was employed by the Debtor; and influenced and advised a competitor and a party intending to compete with the Debtor to employ or otherwise engage the services of a person who was employed by the Debtor.  Accordingly, Hall has breached paragraphs 8(c) and (d) of the Hall Employment Agreement.

94.    As described in detail above, Hall has, directly or indirectly, as an individual, partner, principal, agent, employee, employer, officer, director, shareholder, and/or in some other capacity: solicited business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor and requested, induced and advised customers of the Debtor to withdraw, curtail and cancel their business with the Debtor; solicited business from a customer to whom Hall sold, or who Hall solicited, communicated with, or serviced on behalf of the Debtor during the last six months of his employment with the Debtor pertaining to the brokerage or

manufacture of computer memory and requested, induced and advised customers of the Debtor to withdraw, curtail or cancel their business with the Debtor; accepted business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor and requested, induced and advised customers of the Debtor to withdraw, curtail or cancel their business with the Debtor; and accepted business pertaining to the brokerage or manufacture of computer memory from customers of the Debtor and requested, induced and advised customers of the Debtor to withdraw, curtail or cancel their business with the Debtor, where Hall had contact with the customer during the six months prior to his termination date. Accordingly, Hall has breached paragraphs 8(e), (f), (g) and (h) of the Hall Employment Agreement.

95. The Debtor has fully performed its obligations under the Hall Employment Agreement.

96. The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Hall as follows:

a. awarding to the Trustee damages in a sum in excess of $50,000,000;

b. awarding to the Trustee his costs; and

c. awarding to the Trustee such other and further relief as the Court may deem just and proper.

## BREACH OF CONFIDENTIALITY AGREEMENTS

### COUNT VIII

(Breach of Confidentiality Agreement Against Lewis)

1-84. The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count VIII.

85.    In the Lewis Confidentiality Agreement (**Exhibit 2**), Lewis agreed that the nature of services provided by the Debtor requires that information be handled in a private, confidential manner.

86.    In the Lewis Confidentiality Agreement, Lewis agreed that "[i]nformation about [the Debtor's] business or [the Debtor's] employees or clients will not be released during or after [Lewis'] term of employment to people or agencies outside [the Debtor] without [the Debtor's] written consent … ."

87.    In the Lewis Confidentiality Agreement, Lewis agreed that "[p]ersonal or identifying information about [the Debtor's] employees (such as addresses, phone numbers or salaried [sic]) will not be released to people not authorized by the nature of their duties to receive such information, without the consent of management … ."

88.    As described in detail above, Lewis has utilized and disseminated confidential information about the Debtor's business, employees and clients without the Debtor's written consent.  Accordingly, Lewis has breached the Lewis Confidentiality Agreement.

89.    The Debtor has fully performed its obligations under the Lewis Confidentiality Agreement.

90.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Lewis as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT IX

(Breach of Confidentiality Agreement Against Vance)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count IX.

85.    In the Vance Confidentiality Agreement (**Exhibit 6**), Vance agreed that the nature of services provided by the Debtor requires that information be handled in a private, confidential manner.

86.    In the Vance Confidentiality Agreement, Vance agreed that "[i]nformation about [the Debtor's] business or [the Debtor's] employees or clients will not be released during or after [Vance's] term of employment to people or agencies outside [the Debtor] without [the Debtor's] written consent … ."

87.    In the Vance Confidentiality Agreement, Vance agreed that "[p]ersonal or identifying information about [the Debtor's] employees (such as addresses, phone numbers or salaried [sic]) will not be released to people not authorized by the nature of their duties to receive such information, without the consent of management … ."

88.    As described in detail above, Vance has utilized and disseminated confidential information about the Debtor's business, employees and clients without the Debtor's written consent.  Accordingly, Vance has breached the Vance Confidentiality Agreement.

89.    The Debtor has fully performed its obligations under the Vance Confidentiality Agreement.

90.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Vance as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.      awarding to the Trustee his costs; and

c.      awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT X

(Breach of Confidentiality Agreement Against Malley)

1-84.   The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count X.

85.     In the Malley Confidentiality Agreement (**Exhibit 10**), Malley agreed that the nature of services provided by the Debtor requires that information be handled in a private, confidential manner.

86.     In the Malley Confidentiality Agreement, Malley agreed that "[i]nformation about [the Debtor's] business or [the Debtor's] employees or clients will not be released during or after [Malley's] term of employment to people or agencies outside [the Debtor] without [the Debtor's] written consent … ."

87.     In the Malley Confidentiality Agreement, Malley agreed that "[p]ersonal or identifying information about [the Debtor's] employees (such as addresses, phone numbers or salaried [sic]) will not be released to people not authorized by the nature of their duties to receive such information, without the consent of management … ."

88.     As described in detail above, Malley has utilized and disseminated confidential information about the Debtor's business, employees and clients without the Debtor's written consent.  Accordingly, Malley has breached the Malley Confidentiality Agreement.

89.     The Debtor has fully performed its obligations under the Malley Confidentiality Agreement.

90.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Malley as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

### COUNT XI

(Breach of Confidentiality Agreement Against Hall)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count XI.

85.    In the Hall Confidentiality Agreement (**Exhibit 13**), Hall agreed that the nature of services provided by the Debtor requires that information be handled in a private, confidential manner.

86.    In the Hall Confidentiality Agreement, Hall agreed that "[i]nformation about [the Debtor's] business or [the Debtor's] employees or clients will not be released during or after [Hall's] term of employment to people or agencies outside [the Debtor] without [the Debtor's] written consent ... ."

87.    In the Hall Confidentiality Agreement, Hall agreed that "[p]ersonal or identifying information about [the Debtor's] employees (such as addresses, phone numbers or salaried [sic]) will not be released to people not authorized by the nature of their duties to receive such information, without the consent of management ... ."

88.     As described in detail above, Hall has utilized and disseminated confidential information about the Debtor's business, employees and clients without the Debtor's written consent. Accordingly, Hall has breached the Hall Confidentiality Agreement.

89.     The Debtor has fully performed its obligations under the Hall Confidentiality Agreement.

90.     The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Hall as follows:

a.      awarding to the Trustee damages in a sum in excess of $50,000,000;

b.      awarding to the Trustee his costs; and

c.      awarding to the Trustee such other and further relief as the Court may deem just and proper.

## BREACH OF CONFIDENTIAL DISCLOSURE AGREEMENTS

### COUNT XII

(Breach of Confidential Disclosure Agreement Against Vance)

1-84.   The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count XII.

85.     In paragraph 1 of the Vance Confidential Disclosure Agreement **(Exhibit 7)**, Vance agreed that, during his employment with the Debtor, he may acquire or come into contact with confidential information belonging to the Debtor which is the subject of efforts by the Debtor to maintain the secrecy or confidentiality of the information.

86.     In paragraph 1 of the Vance Confidential Disclosure Agreement, Vance agreed that during and after his employment with the Debtor, he will not: disclose such confidential information to any third party without the prior written consent of the Debtor; and make any use

whatsoever of such confidential information, except to the extent required in order to carry out his duties as an employee of the Debtor.

87.   As described in detail above, Vance has disclosed the Debtor's confidential information to third parties without the prior written consent of the Debtor. Vance has also used the Debtor's confidential information for purposes unrelated to his employment with the Debtor. Accordingly, Vance has breached the Vance Confidential Disclosure Agreement.

88.   The Debtor has fully performed its obligations under the Vance Confidential Disclosure Agreement.

89.   The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Vance as follows:

a.   awarding to the Trustee damages in a sum in excess of $50,000,000;

b.   awarding to the Trustee his costs; and

c.   awarding to the Trustee such other and further relief as the Court may deem just and proper.

### COUNT XIII

(Breach of Confidential Disclosure Agreement Against Herkelman)

1-84.   The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count XIII.

85.   In paragraph 1 of the Herkelman Confidential Disclosure Agreement (**Exhibit 8**), Herkelman agreed that, during his employment with the Debtor, he may acquire or come into contact with confidential information belonging to the Debtor which is the subject of efforts by the Debtor to maintain the secrecy or confidentiality of the information.

86.    In paragraph 1 of the Herkelman Confidential Disclosure Agreement, Herkelman agreed that during and after his employment with the Debtor, he will not: disclose such confidential information to any third party without the prior written consent of the Debtor; and make any use whatsoever of such confidential information, except to the extent required in order to carry out his duties as an employee of the Debtor.

87.    As described in detail above, Herkelman has disclosed the Debtor's confidential information to third parties without the prior written consent of the Debtor. Herkelman has also used the Debtor's confidential information for purposes unrelated to his employment with the Debtor.    Accordingly, Herkelman has breached the Herkelman Confidential Disclosure Agreement.

88.    The Debtor has fully performed its obligations under the Herkelman Confidential Disclosure Agreement.

89.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Herkelman as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.

## COUNT XIV

(Breach of Confidential Disclosure Agreement Against Malley)

1-84.    The Trustee adopts and incorporates herein the allegations of paragraphs 1 through 84 of the General Allegations as paragraphs 1 through 84 of this Count XIV.

85.    In paragraph 1 of the Malley Confidential Disclosure Agreement (**Exhibit 11**), Malley agreed that, during his employment with the Debtor, he may acquire or come into contact with confidential information belonging to the Debtor which is the subject of efforts by the Debtor to maintain the secrecy or confidentiality of the information.

86    In paragraph 1 of the Malley Confidential Disclosure Agreement, Malley agreed that during and after his employment with the Debtor, he will not: disclose such confidential information to any third party without the prior written consent of the Debtor; and make any use whatsoever of such confidential information, except to the extent required in order to carry out his duties as an employee of the Debtor.

87.    As described in detail above, Malley has disclosed the Debtor's confidential information to third parties without the prior written consent of the Debtor.  Malley has also used the Debtor's confidential information for purposes unrelated to his employment with the Debtor.  Accordingly, Malley has breached the Malley Confidential Disclosure Agreement.

88.    The Debtor has fully performed its obligations under the Malley Confidential Disclosure Agreement.

89.    The Debtor has sustained monetary damages in an amount in excess of $50,000,000.

WHEREFORE, the Trustee prays for judgment in his favor and against Malley as follows:

a.    awarding to the Trustee damages in a sum in excess of $50,000,000;

b.    awarding to the Trustee his costs; and

c.    awarding to the Trustee such other and further relief as the Court may deem just and proper.