

TOTAL P.15

## CONFIDENTIAL DISCLOSURE AGREEMENT

1.    I, John Malley, am aware that during my employment with Visiontek, LLC, I may acquire or come in contact with Confidential Information (as hereinafter defined) belonging to VisionTek which is the subject of efforts by VisionTek to maintain the secrecy or confidentiality of the information.  I agree that during and after my employment with VisionTek:

(a) I will not disclose such Confidential Information to any third party without the prior written consent of VisionTek;

(b) I will not make any use whatsoever of such Confidential Information, except to the extent required in order to carry out my duties as an employee of VisionTek; and

(c) At the request of VisionTek, I shall immediately return to VisionTek all Confidential Information or other company property.

2.    For purposes of this Agreement,  "Confidential Information" shall include, without limitation, the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula or improvement which is secret and of value, and any other information, data, reports, plans, interpretations, records, knowledge or know-how in the possession of VisionTek, marketing plans and techniques, cost data, vendor identities, credit histories, product bulletins, prices lists, methodology, customer lists, new product research and development, list of customer identities and requirements, and internal financial data.

3.    I acknowledge and agree that irreparable harm would occur if disclosure or use of any of the Confidential Information were to be made in violation of this Agreement, and that VisionTek shall have the right to seek and obtain injunctive relief upon any violation or threatened violation of the terms of this Agreement, in addition to all other rights and remedies available at law or in equity.

Dated:  _1-3-2001_                                        _John Malley_
                                                          John Malley

## EMPLOYMENT AGREEMEN.

THIS EMPLOYMENT AGREEMENT ("Agreement"), is entered into as of the 18th day of December, 2000 at Gurnee, Illinois, by and between VISIONTEK, an Illinois Corporation ("Corporation") and **John Hall** ("Individual").

### WITNESSETH:

WHEREAS, Individual and the Corporation desire to enter into (or continue) an employment relationship; and

WHEREAS, Individual and the Corporation deem it to be in their respective best interests to state in its entirety the employment relationship as herein provided;

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained, the Corporation hereby employs and Individual hereby agrees to work for the Corporation, upon the following terms and conditions:

1. <u>Employment and Duties.</u>  Individual is hereby employed by the Corporation to serve as an OEM FAE and any other position deemed necessary by the Corporation to further serve the interests of the Corporation in connection with the business conducted by it and to perform such duties consistent with such office and positions as may be reasonably assigned to Individual by an officer or by the Board of Directors of the Corporation from time to time.

2. <u>Time Requirements.</u>    Individual hereby agrees:

(a)   To devote Individual's full professional time, skill, labor and attention to the affairs and activities of the Corporation as may be reasonably required to serve the best interests of the Corporation, and to handle such reasonable administrative and supervisory responsibilities as may be assigned to Individual from to time by an officer or by the Board of Directors of the Corporation; and

(b)    Not to engage in or work during the term of this Agreement for Individual, or any individual, firm or other corporation without the written consent of an officer of the Corporation.

3. <u>Compensation.</u>  The Corporation agrees to pay to Individual compensation for Individual's services hereunder in accordance with the commission schedule or policy in effect at the time of the sale (as defined in that policy), subject to the following terms and conditions:

(a)    As  agreed  to  between  you  and  VisionTek,  your compensation will be a base salary of $3125.00 semi-monthly, which is

John Hall        -- )    )                        ) --)
May 3, 2000
Page 2

annualized to $75,000 per year. Your commission will be based on .005%
total revenue.

(b)    It is understood that a commission is not earned until the
Corporation has collected full payment for the sale.

(c)    The commission shall be payable in installments in
accordance with the then current commission schedule or policy.

(d)    This Agreement is authorization to make such periodic lawful
deductions as may be necessary to recover any advances owed by the
Individual to the Corporation, including a deduction of the full amount due
the Corporation from the final check for uncollectible sales or returned
sales (only up to the amount of any commission already paid for that
"sale").

(e)    Individual also shall be entitled to participate in any 401(k),
profit-sharing or other fringe benefit policy as the Corporation may have in
effect from time to time for employees in the same position in accordance
with the terms of such plans.

4. Reimbursement for Expenses.    Individual shall be entitled to
reimbursement for reasonable out-of-pocket expenses actually incurred by
individual on behalf of the Corporation (including, but not limited to, automobile
expenses), subject to the Corporation's policies regarding out-of-pocket
expenses, and such reimbursement shall not be deemed compensation to
Individual for purpose of Paragraph 3 above.

5. Term; Basis for Termination.    Either party may terminate the
employment relationship at anytime with or without notice. Except for issues
arising under or relating to Paragraphs 7 and 8 of this Agreement, Individual's
rights under this Agreement and concerning the employment relationship shall
be determined, in the event of a dispute, by an independent arbitrator selected in
accordance with the rules of the American Arbitration association and the
decision of the arbitrator shall be final and binding on both parties, and judgment
may be entered by a court of competent jurisdiction on such award. To the
maximum extent permitted by law, the parties waive their rights to a
determination of any such issues by a court or jury.

John Hall
May 3, 2000
Page 3

6. <u>Termination Pay</u>. Upon termination of this Agreement, Individual shall be entitled to the earned commissions and other earned compensation payable to Individual under Paragraph 3 through the termination date, subject to the restriction that Individual shall not be entitled to any commissions (or other compensation) for a sale for which payment is not received by the Corporation after the termination. Calculation of such final commissions (and/or other compensation) will occur promptly and payment will be paid in accordance with the then current commission schedule or policy. Further, Individual shall not be entitled to any commissions for a sale for which an order is received after the date of termination of the employment relationship, regardless of the timing of the original solicitation or prospecting activity, the manner of termination of the employment relationship or the identity of the party terminating the employment relationship.

7. <u>Confidentiality</u>. Individual is aware that, during Individual's employment with the Corporation, Individual may acquire or come in contact with confidential information and trade secrets belonging to the Corporation (which shall include without limitation, the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula or improvement which is secret and of value, and any other information, data, reports, plans, interpretations, records, knowledge or know-how in the possession of the Corporation, marketing plans and techniques, cost data, vendor identities, credit histories, product bulletins, price lists and methodology, customer lists, new product research and development, lists of customer identities and requirements, and internal financial data) which are the subject of efforts by Corporation which are reasonable under the circumstances to maintain the secrecy or confidentiality of the information. Therefore, Individual agrees that, during Individual's employment by the Corporation and thereafter, regardless of the reason for the termination of employment, to the maximum extent permitted by law:

(a) Individual will not disclose such confidential information or trade secrets to any company or person without the prior written consent of the Corporation;

(b) Individual will not make any use whatsoever of such confidential information or trade secrets, except to the extent required in order to carry out Individual's duties as a Corporation employee; and

(c) At the request of the Corporation, Individual will immediately return to the Corporation all confidential information and trade secrets or other corporation property and Individual will not make any use whatsoever of any confidential information or trade secrets which individual may remember.

Individual agrees that the protections for confidential information stated in this Agreement shall expire when the information ceases to be a trade secret or confidential information under the law because the information has become

John Hall
May 3, 2000
Page 4

available to the general public through lawful means. The foregoing rights are without prejudice to and do not restrict the Corporation's rights under the Trade Secret Act.

    8.  Non-competition.    Individual agrees that it is necessary to protect and maintain the proprietary and other legitimate business interests of Employer, including trade secrets and confidential information, and that the nature of Individual's duties are at least national in scope and are conducted largely by telephone and through telemarketing. Consequently, Individual agrees that, while employed by Corporation and for a period of six (6) months following termination of Individual's employment is terminated and regardless of whether the termination was with or without cause, Individual shall not, directly or indirectly, whether as an individual, partner, principal, agent, employee, employer, officer, director, shareholder or in any other capacity:

    (a)    Engage in or own or have any interest in any business that engages computer memory brokerage or manufacturing within the United States.

    (b)    Manage, operate, be employed by or consult for any business that engages in computer memory brokerage or manufacturing within the United States.

    (c)    Solicit for employment or employ or become employed by any person, then, or within the prior six (6) months, employed by the Corporation;

    (d)    Influence or advise any competitor or anyone intending to compete with the Corporation or any subsidiary of the Corporation to employ or otherwise engage the services of any person who is or shall be employed by or in the service of the Corporation or any subsidiary of the Corporation.

    (e)    Solicit any business pertaining to the brokerage or manufacturer of computer memory from customers of the Corporation or any subsidiary of the Corporation or request, induce or advise customers of the Corporation or any subsidiary of the Corporation to withdraw, curtail or cancel their business with the Corporation or any subsidiary of the Corporation; or

    (f)    Solicit any business from any customer to whom Individual sold, or who Individual solicited, communicated with, or serviced on behalf of the Corporation during the last six (6) months of his/her employment with Corporation pertaining to the brokerage or manufacture of computer memory or request, induce or advise customers of the Corporation or any subsidiary of the Corporation to withdraw, curtail or cancel their business with the Corporation or any subsidiary of the Corporation.

John Hall
May 3, 2000
Page 5

      (g)    Accept any business pertaining to the brokerage or manufacture of computer memory from customers of the Corporation or any subsidiary of the Corporation or request, induce or advise customers of the Corporation of any subsidiary of the Corporation to withdraw, curtail or cancel their business with the Corporation or any subsidiary of the Corporation; or

      (h)    Accept any business pertaining to the brokerage or manufacture of computer memory from customers of the Corporation of any subsidiary of the Corporation or request, induce or advise customers of the Corporation or any subsidiary of the Corporation to withdraw, curtail or cancel their business with the Corporation or any subsidiary of the Corporation, where individual had contact with the customer during the six (6) months prior to the termination date.

Notwithstanding the foregoing, individual may make investments in publicly held corporations, if such investment is limited to not more than five percent (5%) of the outstanding issues of such security.

Individual agrees that if Individual breaches this Agreement, then the six (6) month restriction against selling, soliciting or competing imposed under this Agreement shall be extended and shall not expire until six (6) uninterrupted months after Individual permanently ceases to breach this Agreement.

      9.  Enforcement.

      (a)    Individual acknowledge that, for the breach of any of the covenants contained in Paragraphs 7 or 8, the Corporation will suffer irreparable damages for which the remedy at law will be inadequate, and that an injunction may be entered against Individual by any court having jurisdiction, restraining Individual from breaching or continuing the breach. Resort to such equitable relief, however, shall not be construed to be a waiver by the Corporation of any other rights or remedies that the Corporation may have for damages or otherwise.

      (b)    Individual hereby acknowledges the necessity of protection of the Corporation against Individual's competition and that the nature and scope of such protection has been carefully considered by Individual and the Corporation. Individual and the Corporation hereby agree that the unique nature of the business of the Corporation requires the protection specified in this Agreement. The consideration provided for these covenants is deemed to be sufficient and adequate to compensate Individual for agreeing to the restrictions contained herein. Individual acknowledges and represents that Individual can continue to earn sufficient compensation without breaching any of the foregoing restrictions. The period provided, the activities restricted, and the area

John Hall
May 3, 2000
Page 6

covered are expressly represented and agreed to be fair, reasonable and necessary.

(o)    The covenants and provisions of this Agreement are severable. The Corporation and the Individual agree that the restrictions imposed herein are reasonably necessary to protect the legitimate business interests of the Corporation.  However, if any provision or covenant of this Agreement were held to be unenforceable as written and cannot be altered by the court, then the Corporation and the Individual agree that the provision or covenant shall be construed in order that it shall be enforced to the greatest extent possible and, if such construction and enforcement is not possible, then the remainder of this Agreement shall be enforced as if such invalid covenant or provision were not contained in this Agreement. Without limitation of the foregoing, should a court determine that the territory covered by the covenants in Paragraph 7 or 8 is unreasonably long or some other aspect of the clauses is unreasonably broad, the court may amend the terms of such covenants so as to make such covenants reasonable and enforceable.

10. Vacations.  Individual shall be entitled to vacations as mutually agreed upon by the Individual and the Corporation's Officers or Board of Directors. The Individual shall be paid Individual's normal recoverable draw during a vacation consented to by the Corporation.

10.  Governing Law.  .This Agreement shall be construed under the laws of the State of Illinois.

11.  Personal Nature Agreement.    This Agreement and all rights and benefits hereunder are personal to Individual, and neither this Agreement nor any right or interest of individual herein, or arising hereunder, shall be voluntarily or involuntarily sold, transferred or assigned by Individual, provided, however, that Corporation may assign its rights under this Agreement.  The relationship of Individual and the Corporation being of a special and unique nature, it is expressly agreed that this Agreement shall be enforceable in equity by specific performance.

12. Amendments. No amendments to this Agreement shall be valid unless in writing, and signed by all of the parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CORPORATION:
VISIONTEK

**John Hall**
**May 3, 2000**
Page 7

By:

_Erin K. Boys_
Senior Manager, Human Resources

INDIVIDUAL

_John Hall_

DATE:   1-11-01



The nature of services provided by VisionTek requires that information be handled in a private, confidential manner.

Information about our business or our employees or clients will not be released during or after my term of employment to people or agencies outside the company without our written consent; the only exceptions to this policy will be to follow legal or regulatory guidelines. All memoranda, notes, report, or other documents will remain part of the company's confidential records.

Personal or identifying information about our employees (such as addresses, phone numbers or salaries) will not be released to people not authorized by the nature of their duties to receive such information, without the consent of management of the employee.

The undersigned individual agrees to abide by this confidentiality agreement.

Date: 5-3-00

_____
Employee Signature

_____
Employee Name (Print)

10/10/2002    11:38    JTG PAYROLL → 913122642437.                                NO.095    P02

ET89912016

# MUTUAL CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (Agreement) dated as of Feb., 01, 2002 by and between VisionTek, Inc. (VisionTek), having its principal place of business located at 1175 Lakeside Drive, Gurnee, Illinois, and MiTAC International Corp. having its principal place of business located at No. 1, R&D 2nd Road, Hsin-Chu Science Based Industrial Park Hsin-Chu Hsien, Taiwan, ROC.

WHEREAS, each party desires to furnish and provide to the other party proprietary written documentation and oral information of a highly confidential nature.

WHEREAS, each party Recipient agrees, as a condition to receiving any confidential documentation and information, to hold and maintain all confidential documentation and information received in confidence and each party agrees not to use any confidential documentation and information for any purpose other than contemplated herein.

THEREFORE, in consideration of the foregoing recitals, and the respective representations and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Recitals.**    The foregoing Recitals are hereby incorporated by this reference and made a part of the Agreement as fully reinstated herein.

2.  **Definition.**    Confidential proprietary information and trade secrets which may be provided to either party includes, without limitation, any information relating to products, proposed products, price lists, cost data, trade secrets, marketing plans, vendor identities, financial data, the whole or any portion or phase of any scientific or technical information, design, process, procedure, manufacturing methods, formula or improvement (hereinafter "Confidential Information").

3.  **Confidentiality**    Each party agrees that as a condition to Confidential Information being furnished to the other, each party shall hold and maintain all Confidential Information in strict confidence. Furthermore, each party agrees not to disclose Confidential Information to any company, entity or person without the prior written consent of the other party for a period of three (3) years from the date hereof.

4.  **Restrictions**    Notwithstanding the foregoing, each party shall not be restricted in its use or disclosure of Confidential Information to the extent that any such information:

    a.  was not disclosed in writing designating such information as confidential or proprietary, or, if first orally disclosed, was not reduced to a writing designating such information to be confidential or proprietary within thirty (30) days of such oral disclosure;

    b.  was known to the receiving party at the time of its disclosure to the receiving party;

    c.  is publicly known or hereinafter becomes public knowledge without the breach of the restrictions contained in this Agreement;

    d.  is obtained by such party from a third party not

1

14

under any obligation of confidentiality;

e.    is subsequently developed by either party independent of disclosure; provided; however, that the burden of proof shall be on the receiving party;

f.    is required to be disclosed by court order or governmental regulation (which information shall be made available for review by the other party prior to such disclosure to the extent practicable); or

g.    is required to be disclosed or maintained for reason of audit by the receiving party to its certified public accountants or in order to comply with such parties' contractual obligations with its institutional Lender(s).

5.    **Return.** At the request of either party, all Confidential Information will be returned and, thereafter, neither party shall distribute or make any use whatsoever of any Confidential Information.

6.    **Standard of Care.** Each party shall use at least the same degree of care to avoid inadvertent disclosure or unpermitted use of the other party's Confidential Information which it employs with respect to its own proprietary or confidential information of a similar nature which it does not wish to have disseminated, published or disclosed but in no event less than a reasonable standard of care. Any person to whom such Confidential Information is made available shall be aware of the confidential nature of the Confidential Information and the restrictions imposed herein.

7.    **Additional Restrictions.** The receiving party will not reverse engineer, decompile or disassemble Confidential Information disclosed to the receiving party if specifically requested by the disclosing party.

8.    **Ownership.** All Confidential Information is and shall remain the property of the disclosing party. The receiving party shall be entitled to make only one (1) copy of the disclosing party's Confidential Information. Additional copies shall be made only upon the disclosing party's prior written approval. All Confidential Information, and any copies thereof, shall be promptly returned to the disclosing party upon written request; provided that the receiving party may retain one (1) copy in a confidential file for archival purposes.

9.    **Term.** This Agreement shall remain in full force and effect for all disclosures of Confidential Information which occur three (3) years from the date first set forth above. Notwithstanding the earlier termination or conclusion of this Agreement, the restrictions and obligations contained in this Agreement shall continue for a period of three (3) years from the date of each disclosure made pursuant to this Agreement.

10.    **Miscellaneous.**

(a)    This Agreement constitutes the entire Agreement and understanding of the parties with respect to the

2

subject matter of this Agreement. Any amendment or modification of the Agreement shall be in writing and executed by duly authorized representatives of the parties.

(b)    This Agreement shall be binding upon the parties, their successors and assigns. Neither party shall assign the Agreement without the other party's prior written consent.

(c)    No right or license or contract whatsoever, either express or implied, is granted to either party pursuant to this Agreement under any patent, patent application, copyright, trademark, trade secret, or other intellectual property or proprietary right now or hereafter owned or controlled by the other party, and no future employment or relationship is promised, expressed or implied hereunder.

(d)    Subject to the confidentiality requirements and use restrictions contained in this Agreement, no party to this Agreement is restricted from developing, manufacturing, or selling products, or otherwise engaging in business conduct, independently or in conjunction with others, which involves the subject matter of this Agreement.

11.    Governing law    This Agreement shall be governed and controlled by the laws of the State of Illinois. Both parties consent to jurisdiction in the State of Illinois and venue in Cook County, Illinois, and both parties hereby waives any and all right to contest said jurisdiction and venue.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be duly executed by their proper officers as of the first date above written.

VISIONTEK, INC.                          Company Name: MITAC International Corp.

By: _____        By: _____

Name: MICHAEL BLATZ                   Name: S.C. Lee

Title: SENIOR VICE PRESIDENT          Title: Director

Date: 22 MAR. 02                      Date: 3.6.2002

3

# NON-DISCLOSURE AGREEMENT

This NON-DISCLOSURE AGREEMENT (this "Agreement") by and between Visiontek, Inc. ("Visiontek") and Advanced Equities ("The Party"), is entered into and is effective as of February 21, 2002 (the "Effective Date").

WHEREAS, in connection with discussions regarding financing or other transactions, Visiontek may provide The Party with certain confidential and/or proprietary information.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt, sufficiency and adequacy of which is hereby acknowledged, intending to be legally bound, Visiontek and The Party hereby agree as follows:

1.    Definition of Confidential Information.

A.    For the purposes of this Agreement, "Confidential Information" means information disclosed by Visiontek or any of its affiliates, accountants, attorneys, representatives or other agents to The Party or any of its affiliates, accountants, attorneys, representative or other agents, including but not limited to financial statements and any information regarding business operations, business opportunities, trade secrets, any information relating to product plans, designs, ideas, concepts, costs, prices, finances, personnel, marketing and promotion plans of products or services, financial information and business practices or policies, lists of customers and potential customers, and customer and potential customer information, research, development or know-how and any other technical or business information of Visiontek or the terms or existence of this Agreement.

B.    Confidential Information shall not include information that (a) is now or subsequently becomes generally available to the public through no fault or breach on the part of The Party, (b) The Party can demonstrate to have had lawfully in its possession without an obligation of confidentiality prior to disclosure hereunder and not otherwise in breach of this Agreement; (c) was independently developed by The Party without the use of any Confidential Information as evidenced by written documentation; or (d) The Party lawfully obtains from a third party who has the right to transfer or disclose it and who provides it without any obligation to maintain the confidentiality of such information.

2.    Non-Disclosure and Non-Use of Confidential Information.

A.    The Confidential Information is provided for the sole purpose of discussing financing or other transactions involving Visiontek and The Party (the "Business Purpose"). The Party shall not copy, reproduce, disclose, publish or disseminate any Confidential Information to anyone other than its employees and/or legal and financial advisors (under a duty of confidentiality no less restrictive than the terms hereof whether by pre-existing

agreement or relationship) who need to know for the Business Purpose, and The Party shall use at least the same degree of care used by it to protect the unauthorized use, disclosure, publications or dissemination or its own Confidential Information, but in any case no less than a reasonable degree of care.

B.      The Party accepts the Confidential Information for the Business Purpose and in connection with the discussions hereunder.  Other than for the Business Purpose, The Party shall not use Confidential Information for its own or any third party's benefit.  If The Party receives notice that it may be required or ordered by any judicial, governmental, or other judicial or regulatory entity to disclose any Confidential Information, The Party shall (a) give Visiontek sufficient prior written notice in order to contest such requirement or order and, (b) at Visiontek' sole expense, cooperate with Visiontek in seeking a protective order or other remedy to limit the disclosure of such Confidential Information to the extent required under this Agreement.

C.      If this Agreement or any of its terms or any Confidential Information must be disclosed under any law, order, rule or regulation, The Party shall (a) first give written notice of the intended disclosure to Visiontek, within a reasonable time prior to the time when disclosure is to be made, (b) redact mutually agreed upon portions of this Agreement and any other Confidential Information to the fullest extent permitted under any applicable laws, rules and regulations, and (c) submit a request, to be mutually agreed upon by the parties, at Visiontek's sole expense, that such portions and other provisions of this Agreement and/or any other Confidential Information receive confidential treatment under the laws, rules and regulations of the body or tribunal to which disclosure is being made or otherwise be held in the strictest confidence to the fullest extent permitted under the laws, rules or regulations of any other applicable governing body.

3.      No Warranty.  ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS," AND EACH PARTY HEREBY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES REGARDING ITS ACCURACY, COMPLETENESS, PERFORMANCE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR ITS MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

4.      No Obligation to Complete Transactions.  Nothing herein shall be deemed to impose any obligation on either party to proceed with any transaction discussed in connection with the Business Purpose, and each party reserves the right to terminate discussions regarding the Business Purpose at any time.  Nothing herein shall be construed to impose any obligation on Visiontek to disclose any Confidential Information.

5.      Return of Documents.  Within ten (10) business days of receipt of a written request by Visiontek, The Party shall destroy or return to Visiontek all Confidential Information, whether tangible or in electronic form, and an officer of The Party shall certify that all such materials have been destroyed or returned.

2

6.    No License.  The Party acknowledges and agrees that nothing contained in this Agreement will be construed as granting any rights, by license or otherwise, to The Party to any Confidential Information or to any of Visiontek's copyrights, patent rights, trade secrets, or other proprietary rights, except as expressly set forth in this Agreement.

7.    Equitable Relief.  The Party acknowledges that all of the Confidential Information is the exclusive property of Visiontek (or its licensors) and that the unauthorized disclosure or use of such Confidential Information would cause irreparable harm and significant injury, the monetary effect of which would be difficult to ascertain.  Accordingly, The Party agrees that Visiontek shall have the right to seek immediate injunctive relief against any breach of this Agreement, in addition to any and all other rights and remedies available at law or in equity for such a breach except as otherwise expressly provided herein.

8.    General.  This Agreement constitutes the entire agreement with respect to the Confidential Information disclosed hereunder and supersedes all prior or contemporaneous oral, or written agreements concerning such Confidential Information.  This Agreement may not be amended except by the written agreement signed by authorized representatives of both parties.  If any term of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable term shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties as set forth in this Agreement.  Visiontek may assign this Agreement, and any benefits of the Confidential Information, to any entity, corporate or other, hereinbefore or hereinafter created, of which Visiontek or any of the current shareholders of Visiontek, directly or indirectly, is an equity owner.  The Party shall not assign this Agreement nor transfer any benefits of Confidential Information, directly or indirectly (through acquisition, merger or otherwise), and any attempt to do so without the prior written consent of Visiontek shall be null and void.  The relationship of the parties is that of independent contractors, and not of agency, partners, joint ventures or the like.  This Agreement shall be binding on the parties and their respective successors, assigns, employees, agents, officers, directors and shareholders.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original, and all of which shall constitute the same agreement.

9.    Authority.  By signing below, the undersigned representatives of the parties warrant and represent that they have full authority to execute this Agreement on their respective party's behalf and to bind their respective party to the terms hereof.

10.    Term of Obligations.  The term of this Agreement is perpetual from the Effective Date. Notwithstanding the foregoing, Sections, 1, 2, 3, 5, 7, 8 and 10 of this Agreement will survive any termination of it.

**VISIONTEK**

By: _____

Name: <u>Andrew Zahn</u>

Title: <u>Director</u>

Date: <u>Febuary 20, 2002</u>

By: _____

Name: _____

Title: _____

Date: _____

60037185

4

TOTAL P.06

Mar  7 2002  15:14   P.05

**VISIONTEK**

By:

Name: Andrew Zahn

Title: Director

Date: Febuary 20, 2002

By: Dwight O. Budget

Name: Dwight O. Budget

Title: President

Date: 3-7-02

60027185

4



August 27, 2002

Via Facsimile 410 822 0217

Ken Mann
Equity Partners, Inc.
28799 Springfield Drive
Easton, MD 21601

Re: VisionTek, LLC Asset Acquisition

Dear Ken:

It was a pleasure speaking with you last week.

As we discussed, my firm represents a group that is interested in purchasing some of the assets of VisionTek, LLC (the "Company"). Specifically, they are interested in purchasing all brand names, trade names, trademarks and exclusive rights to all intellectual property of the Company. In addition, it is their desire to compete in the graphics card space that the Company previously occupied and, accordingly, they would like to hire two former employees of the Company who are currently subject to non-compete agreements.

While it is questionable whether the non-compete agreements are even enforceable when the Company is currently being liquidated, we would like to avoid any litigation regarding the non-compete agreements. Therefore, in exchange for the sum offered below, we would ask for a release from the Company for any and all potential claims in connection with the non-compete agreements.

Our client is willing to pay $400,000 for this group of assets and will fund the purchase on or before September 20, 2002. Please contact me at your earliest convenience to discuss our proposal.

Sincerely,

Chris R. Pravecek
Executive Vice President
General Counsel

# CERTIFICATE OF REGISTRATION

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

REGISTER OF COPYRIGHTS
*United States of America*

**OFFICIAL SEAL**

## FORM TX

For a Nondramatic Literary Work
UNITED STATES COPYRIGHT OFFICE

REGIST

**TX 5-505-153**

*TX0005505153*

EFFECTIVE DATE OF REGISTRATION

NOV 15 2002

Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

**1** TITLE OF THIS WORK ▼

VisionTek FAQ's

PREVIOUS OR ALTERNATIVE TITLES ▼

PUBLICATION AS A CONTRIBUTION If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    Title of Collective Work ▼

If published in a periodical or serial give:  Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

**2**

**a** NAME OF AUTHOR ▼

VisionTek, LLC

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶_____
{ Domiciled in ▶ U.S.

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼
Entire Text

**b** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶_____
{ Domiciled in ▶_____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c** NAME OF AUTHOR ▼

DATES OF BIRTH AND DEATH
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

AUTHOR'S NATIONALITY OR DOMICILE
Name of Country
OR { Citizen of ▶_____
{ Domiciled in ▶_____

WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK
Anonymous?    ☐ Yes ☐ No
Pseudonymous?    ☐ Yes ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

NATURE OF AUTHORSHIP Briefly describe nature of material created by this author in which copyright is claimed. ▼

**3**

**a** YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED This information must be given in all cases.
2002 ◀ Year

**b** DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK
Complete this information ONLY if this work has been published.
Month ▶ approx. June  Day ▶ *1  Year ▶ 2002
U.S. ◀ Nation

**4**

See instructions before completing this space.

COPYRIGHT CLAIMANT(S) Name and address must be given even if the claimant is the same as the author given in space 2. ▼

VisionTek
1175 Lakeside Drive
Gurnee, IL  60031

TRANSFER If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

APPLICATION RECEIVED
NOV 15 2002
ONE DEPOSIT RECEIVED
NOV 15 2002
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE
OFFICE USE ONLY

---

**MORE ON BACK ▶**
• Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
• See detailed instructions.
• Sign the form at line 8.

DO NOT WRITE HERE
Page 1 of _____ pages



# BFG TECHNOLOGIES

# Frequently Asked Questions About Asylum IV GeForce Graphics Cards

**Q: Will the drivers on NVIDIA's website work with Asylum graphic cards?**

A: Yes. We use NVIDIA's Detonator drivers for all our NVIDA based graphic accelerators. The drivers are available to download directly from NVIDIA's site.

**Q: I installed the video card and the system locks up in 2D & 3D applications frequently. What can I do?**

A: It's possible that you have a hardware conflict with another device that Windows is not detecting. Ideally, your card should be on IRQ 11 and should not share with other devices except the non-PCI hosts or PCI steering. This is a common problem when IRQ 9 is enabled. AGP devices to assign a lot of devices on IRQ 9 and/or 11, which is very problematic with your configuration. BFG Tech recommends a power supply that is 250W minimum (300W preferred). Some older 440LX, 440BX, and super socket 7 motherboards use a non-video AGP socket which may not be providing enough power to sustain the card in 3D applications. Right click on my computer on desktop and select properties. Go to device manager and select settings. Here you can view IRQ resources for all devices. Contact the manufacturer of your computer/motherboard for help on reassigning IRQ resources if multiple devices are sharing an IRQ with video card.

**Q: I recently bought your Asylum GeForce card and**

**Q: My 2D image quality is poor (fuzzy, ghosting, smeared bold text). How can I fix it?**

A: Make sure that your internal and external power cables are not too close to your GeForce and your monitor signal cable. It is possible that this problem only turns up after recovering from your monitor's power saving mode. Try rebooting. Try changing the "Monitor timing" in "other options" in the NVIDIA control panel in that GTF and then DMT.
Try changing the refresh rate - you may want to try just altering it by 1hz or so by setting up a custom refresh rate to see if the problem goes away.
Make sure that drivers are to electrical devices near your PC and monitor that may be causing interference.

**Q: What does WHQL mean?**

A: WHQL stands for Windows Hardware Quality Labs. For more information about WHQL, please visit Microsoft's website.

**Q: I noticed the minimum requirements for your GeForce4 products (per the outside of the retail packaging) say that an AMD K-2, PII processor (or faster) is necessary for the card to function. Is this really true?**

A: We have successfully installed GeForce 4 based cards in some of these older platforms and were able to use the card for general Windows applications and many 3D games.

:::FAQs:::

when I try to play the game it will not load, its all just blank on my screen. I have all the latest patches for my game. It used to run on my VOODOO, but after I change it to my Asylum card it won't run anymore?
A: There have been some issues that occur which are caused by the existance of old voodoo drivers on the system still when adding an NVIDIA card and drivers. Be sure you have completely uninstalled all remnants of previous voodoo drivers in your system (and registry) before attempting to play any game/3D applications. Keep in mind that NVIDIA DOES NOT CURRENTLY SUPPORT Glide. If the game uses Glide, it won't work. Perhaps you should consider a reformat if the game uses DirectX or OpenGL.

After uninstalling Voodoo card -
1. Do a search for 3dfx*.*
2. Delete all files that are found.
3. Delete file GLIDE2X.dll and/or glide2x.dll.

Q: Games stutter with my Asylum card. How can I fix it?
A: Make sure you have the latest drivers installed.
- Make sure that you have closed down all programs before you start the game - press Ctrl-Alt-Delete and select all the programs one by one except "Explorer" and "Systray" and click "End Task". Even if a program says that it is "Not Responding" after 20 seconds, you should still be able to close it. If the problem persists, switch off your screensaver and desktop background before starting the game.
- Make sure that Video-BIOS shadowing is disabled in your BIOS.
- If you have a network card installed, try setting the connection type in the Network Control Panel from the automatic sensing option to the type of network that you use (10Base-T, 100Base-T, full / half duplex).
- Make sure that your Asylum card is not sharing any IRQs with another card - the only device that can have the same IRQ is the "IRQ Holder for PCI Steering". If you find that the Asylum is sharing IRQ, try moving the card that it is starting the IRQ with to another slot.
- You may find that switching your desktop color depth to 256 colors helps with stuttering problems.
- You can try disabling side-band-addressing in the NVIDIA control panel. This has helped some people with stuttering problems; however, it may result in reduced image quality and overall speed.

Q: I can't get AGP working, Direct-X Diagnostics fail, or I get lockups in games. How can I fix it?
A: Here are some things to consult with motherboard manufacturer about:
- I/O voltage of the motherboard
- AGP driving control value (Athlon/Duron systems)
Things to experiment with:
- AGP aperture size
- AGP 2x/4X mode
- AGP fast writes
- Be sure your card is on IRQ 11 and no other devices share same IRQ
- Be sure you have Vin-4 in 1 driver ver 4.25 or later (Via chipset)
- Be sure you have latest AGP VIA AGP driver (if Via chipset)
- Be sure you have latest AMD AGP miniport driver (If AMD chipset)

Q: What are the recommended requirements for GeForce 4 cards?
A: The NVIDIA based GPU (processor) on our cards works independantly and in conjunction with your system processor, chipset and memory. This means that the faster the system, the more likely your graphics accelerator will perform better. Recommended minimum requirements for GF4 based cards is 600MHz or higher with 128MB of RAM. For optimum performance, we recommend a 1 GHz processor or higher along with 256MB or of RAM

Q: I notice that BFG Tech and NVIDIA frequently post new drivers on their website. I'm happy with the way my card is performing. Should I upgrade?
A: BFG Tech recommends that you do not upgrade to newer drivers if you are happy with the way your system is functioning now with our graphic accelerator installed.

Q: What is the WDM driver? Do I need it?
A: The WDM driver is a video capture driver. It is necessary to install the WDM driver for video capture on the Asylum GeForce 4 Ti 4600 with TV-IN/OUT card. Currently, it's unnecessary to install the WDM drivers for other BFG Tech cards.

Q: Will the WDM drivers posted on your website work in all Windows Operating Systems?
A: The WDM drivers posted on our website is appropriate for Win98, ME, 2000, and XP. Windows NT does not support this driver.

Q: Should I use Detonator 3 drivers of Detonator 4 drivers with my card?
A: The Detonator 4 drivers are optimized for GeForce 3 and GeForce 4 series cards. As with all NVIDIA drivers, the Det 4 drivers are universal drivers that support NVIDIA's full lineup of processors. They are backwards compatible with all our cards. The Det 4 drivers are optimized for GeForce 3 and GeForce 4 cards. This means that you may, or may not experience a performance increase with GeForce 2 cards and lower using these drivers. However, you may find that installing the Det 4 drivers may fix some problems or improve compatibility in certain applications or games. You never discover that older drivers seem to work better with your card.

Q: Is there a difference between Detonator 4 and Detonator XP drivers?
A: There is no difference.

Q: When I go to load the driver for my Asylum GeForce 2 MX 200 my model is not listed. Should I choose the driver for MX/MX400? If so, why does it say the driver was not written specifically for my card?
A: It lists instances, choose the driver that says GeForce 2 MX or MX/MX400. Our drivers are unified drivers and will work with all of our video cards. This issue has been eliminated with the release Detonator 2 Version 12.41 and newer driver released.

Q: How can I register my graphics card and tech support?
A: There is no need to register your card. Just be sure to keep a copy of your receipt as proof of purchase and you will be entitled to the warranty and tech support?

:::FAQs:::

entitled to the full warranty and technical support.

**Q: I have an Asylum GeForce 2 MX400. When I go to launch a game my screen goes black. How can I resolve this?**
A: In Windows 98 or ME try changing your monitor refresh rate to Adapter Default. In Windows 2000 try 60HZ. To reach this setting, Right-click on your desktop and click Properties. Go to the Settings Tab and click the Advanced Button. Go to the Adapter Tab (for Win98/ME) or the Monitor Tab (for Win2K). You should see the refresh rate listed. If you have Windows 2000 or XP you can also try a utility called PowerStrip (a RIVATuner and NVIDIA refresh fix tool) located on the internet.

**Q: When I go to DirectX diagnostics, my acceleration features are showing as not available. Why is this?**
A: You may have some Windows corruption or remnants of previous video card drivers. Make sure all previous video card drivers are removed. It is recommended that you re-format your hard drive to clean and reinstall your file system.

**Q: How many watts should my power supply be in order to run one of your graphics cards?**
A: We recommend 250 watts for GeForce 2 based cards and 300 watts for both 185w combined for GeForce 4 cards.

**Q: My motherboard manual says I need a video card that will run on a 1.5V AGP Pro slot. Are your cards compatible with this?**
A: All of our AGP graphics cards will run on a 1.5V AGP Pro slot.

**Q: I don't have DDR memory on my motherboard but the video card has it. Do I need DDR memory to run the card?**
A: No. Your system ram and video ram are mutually exclusive.

**Q: What is the max resolution that I can have on my regular TV and my HD-TV?**
A: Regular TV's max out at 800x600, HD-TV: 1280x720 pixels progressive, 1920x1080 pixels interlaced

**Q: What is the max resolution that is supported through the DVI-I connector?**
A: 1280x1024 (Non-nView Mode)

- UC or USWC bios setting for video bios (in your motherboard bios)
- Try the card in a different system if possible
- Reformat if you've had other video cards in system before if none of this helps, contact motherboard mfr for more direction. They may have a quick fix

**Q: I have a motherboard with a VIA chipset, you may need to install updated chipset drivers. VIA offers a 4-in-1 driver update for Win98/ME/NT. Be sure to install the updated AGP drivers included in the 4-in-1 driver update. The AGP drivers are not supported in WinNT. http://www.viaarena.com/?PageID=2. Make sure that you installed the VIA AGP driver in 'Turbo' mode - otherwise you will be restricted to AGP1x only.**

**Q: My computer has onboard graphics, when I install the Asylum card the computer boots but the screen remains blank, what do I do?**
A: You will have to disable the onboard video card prior to installing the Asylum card. You may want to contact your motherboard or computer manufacturer if you are not sure you know how.

**Q: When I install my Asylum card I can only set the card to use 640x480 with 16 colors. How can I fix it?**
A: Make sure that you have 'Assign IRQ to VGA' set in your BIOS setup.
Make sure that you have uninstalled all old video drivers using the uninstallation programs provided, and also by uninstalling old NVIDIA drivers.
Make sure that you have installed the latest AGP drivers for your motherboard's chipset.
Make sure that you have the correct monitor drivers installed. If you are using the standard Windows monitor drivers and your monitor does not have specific drivers available, try a different Windows monitor driver.
Make sure that the video card has it's own IRQ assigned to it and is not sharing an IRQ with other devices (IRQ holder for PCI steering is OK to share with it). IRQ 11 for video card is strongly recommended.

**Q: All 3D applications are slow on my Asylum card. How can I fix it?**
A: If you are using a non-Intel chipset based motherboard, make sure to download and install the latest AGP drivers from your chipset manufacturer's website. If you have a low end CPU, then you may have to upgrade your CPU to make the most out of the Asylum card. Only higher end CPUs can take full advantage of the power of the Asylum, despite the T&L engine. In particular, any AMD Super Socket 7 table may not truly give poor performance, due to the poor AGP implementations on most Super Socket 7 motherboards.

:::FAQs:::

:::FAQs:::

**ASYLUM TI 4600 | TI 4200 | MX 440-SE | MX 420 | MX 200 | MX 400 | Drivers | .pdf Manuals | Where to buy | FAQs**



**OFFICIAL SEAL**

This Certificate issued under the seal of the Copyright Office in accordance with title 17, United States Code, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

*Marybeth Peters*

**REGISTER OF COPYRIGHTS**
*United States of America*

# FORM TX
**For a Nondramatic Literary Work**
**UNITED STATES COPYRIGHT OFFICE**

REGISTRATION NUMBER

**TX 5-505-154**

EFFECTIVE DATE OF REGISTRATION

**NOV 15 2002**
Month    Day    Year

---

**DO NOT WRITE ABOVE THIS LINE. IF YOU NEED MORE SPACE, USE A SEPARATE CONTINUATION SHEET.**

## 1

**TITLE OF THIS WORK ▼**

VisionTek Installation Instructions

**PREVIOUS OR ALTERNATIVE TITLES ▼**

**PUBLICATION AS A CONTRIBUTION** If this work was published as a contribution to a periodical, serial, or collection, give information about the collective work in which the contribution appeared.    **Title of Collective Work ▼**

If published in a periodical or serial give:    Volume ▼    Number ▼    Issue Date ▼    On Pages ▼

## 2

**a**

**NAME OF AUTHOR ▼**

VisionTek, LLC

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☒ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶ U.S.

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼
Entire Text

**NOTE**
Under the law, the "author" of a "work made for hire" is generally the employer, not the employee (see instructions). For any part of this work that was "made for hire" check "Yes" in the space provided, give the employer (or other person for whom the work was prepared) as "Author" of that part, and leave the space for dates of birth and death blank.

**b**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

**c**

**NAME OF AUTHOR ▼**

**DATES OF BIRTH AND DEATH**
Year Born ▼    Year Died ▼

Was this contribution to the work a "work made for hire"?
☐ Yes
☐ No

**AUTHOR'S NATIONALITY OR DOMICILE**
Name of Country
OR { Citizen of ▶
Domiciled in ▶

**WAS THIS AUTHOR'S CONTRIBUTION TO THE WORK**
Anonymous?  ☐ Yes  ☐ No
Pseudonymous?  ☐ Yes  ☐ No
If the answer to either of these questions is "Yes," see detailed instructions.

**NATURE OF AUTHORSHIP** Briefly describe nature of material created by this author in which copyright is claimed. ▼

## 3

**a** **YEAR IN WHICH CREATION OF THIS WORK WAS COMPLETED** This information must be given in all cases.
~~2002~~ 2001 ◀ Year

**b** **DATE AND NATION OF FIRST PUBLICATION OF THIS PARTICULAR WORK**
Complete this information ONLY if this work has been published.
Month ▶ approx. Nov.  Day ▶ ~~15~~  Year ▶ 2001
Nation ▶ U.S.

## 4

**COPYRIGHT CLAIMANT(S)** Name and address must be given even if the claimant is the same as the author given in space 2. ▼

VisionTek
1175 Lakeside Drive
Gurnee, IL 60031

**TRANSFER** If the claimant(s) named here in space 4 is (are) different from the author(s) named in space 2, give a brief statement of how the claimant(s) obtained ownership of the copyright. ▼

See instructions before completing this space.

APPLICATION RECEIVED
NOV 15 2002
ONE DEPOSIT RECEIVED
NOV 15 2002
TWO DEPOSITS RECEIVED

FUNDS RECEIVED

DO NOT WRITE HERE — OFFICE USE ONLY

---

**MORE ON BACK ▶**
- Complete all applicable spaces (numbers 5-9) on the reverse side of this page.
- See detailed instructions.    • Sign the form at line 8.

**DO NOT WRITE HERE**
Page 1 of _____ pages

## Table of Contents

Section I        Preparing Your Computer  . . . . . . . . . . . . . . .1

Section II       Installation Steps . . . . . . . . . . . . . . . . .1-2

Section III      Windows 98 and ME Setup . . . . . . . . . . . . .3-4

Section IV       Windows NT 4.0 Setup . . . . . . . . . . . . . . .4

Section V        Window 2000/XP Setup . . . . . . . . . . . . . . .5

Section VI       Feature Guide . . . . . . . . . . . . . . . . . .6-10

Section VII      Troubleshooting Tips . . . . . . . . . . . . . .10-17

NVIDIA Hardware and Software

# I. Preparing Your Computer

## Preventing Electrostatic Discharge Damage

### STATIC WARNING!

Before installing a 3D graphics accelerator, read the following instructions to prevent electrostatic discharge (ESD) damage to the equipment. ESD is a discharge of stored static electricity that can damage equipment and impair electrical circuitry. It occurs when electronic components are improperly handled and can result in complete or intermittent failures.

- Before opening the chassis, ensure that power to the computer system is OFF, and power cord is disconnected.

- Always use an ESD preventive wrist or heel strap and ensure that it makes good skin contact.

- Avoid contact between equipment and clothing. The wrist or heel strap only protects the equipment from ESD voltage on the body; ESD voltage on clothing can still cause damage.

- Handle graphics card by the edges only; avoid touching the components, traces, or any connector pins.

- Do not remove the wrist or heel strap until the installation is complete.

BFG Tech assumes no liability for any damage (caused directly or indirectly) by improper installation of any components by unauthorized service personnel. If you do not feel comfortable performing the installation, consult a qualified computer technician. Damage to system components, the accelerator card, and/or personal injury may result if power is applied during installation.

# II. Installation Steps

Now that you have prepared your computer, you are ready to install your graphics accelerator card:

1. Power must be off to the computer and monitor. Disconnect the display power cord from the back of your computer, as well as the display cable.

[1]

2. Remove the computer cover. If necessary, consult your computer manual or help.

3. If you intend to run multiple displays with Windows 98/2000 then proceed to step 4. Otherwise, remove any existing graphics card from your computer. Or, if your computer has any on-board graphics capability, you may need to disable it on the motherboard. For more information, see your computer documentation.

4. If necessary, remove the metal cover from the empty expansion slot that you select (AGP cards must use the AGP slot). Align your new Asylum card with the expansion slot, and press it in firmly until the card is fully seated.

5. Use the slot cover screw to fasten the card in place, and replace the computer cover.

6. Plug the display cable into your card, and reconnect the power cord. Power on your system.

## III Windows 98 and ME Setup

After installing your new video card and restarting your computer, Windows may detect new hardware and show the "Add New Hardware Wizard" dialog box. Complete the following procedure:

1. Click 'Next' on the screen that says the wizard found "Standard PCI Graphics Adapter (VGA)". (It's OK that it says, "PCI", even if your card is AGP)

2. Choose "Search for the best driver" and click 'Next'.

3. THIS STEP WIN98 ONLY – Deselect all search location buttons on the 'search for new drivers' window, then click 'Next'.

4. THIS STEP WIN98 ONLY – Windows will use the Standard PCI Graphics Adapter (VGA) device as a foundation for the NVIDIA drivers. This is OK. Click 'Next'.

[2]

5. Click 'Finish', then restart your computer.
6. After restarting, insert the driver cd, right click on your PC's desktop.
7. Then click on properties then 'Settings'.
8. Click 'Advanced'.
9. Click 'Adapter', then click, 'Change'.
10. THIS STEP WIN98 ONLY - ME USERS, GO TO STEP 11 – Update Device Driver Wizard' dialog box appears.
11. Choose 'Display List of all Drivers', then click 'Next'.
12. Click, 'Have Disk'.
13. In the 'Install from Disk' window, click 'Browse'.
14. Navigate to your CD-ROM drive, and find the folder, 'Win9B_ME'.
15. Open the correct driver folder, then double click on the .inf file displayed.
16. Verify that your newly installed card is highlighted.
17. Click 'Next'.
18. When the installation is complete, click 'Finish', 'Apply', and 'Restart' in the remaining open windows to complete the process. Your card is now ready for use.

## IV. Windows NT 4.0 Setup

A user must have Windows NT Administrator privileges to install these drivers. Consult your system administrator or Microsoft Windows NT User's Manual for more information on Administrator privileges.

1. Let Microsoft Windows NT 4.0 load completely and log in. Insert driver CD.
2. Click the Start button on the tool bar, point to Settings, and click Control Panel.
3. Double-click the Display icon, click on the Settings tab, click Display Type, and finally click Change.

3

4. Insert the driver CD into the CD-ROM drive, and click Have Disk.
5. Select or type the path to the CD's Nt directory, then click OK. (Windows should find files for your graphics card.)
6. If Windows finds the files, select OK.
7. If Windows cannot find the files, verify that the path is correct and the correct driver CD is inserted.
8. Click YES when Windows informs you that you are installing a third party driver and asks if you wish to proceed. (Windows NT will copy the files to the hard disk.)
9. Click OK, click Close, then Close again. Windows NT will ask if you wish to restart the computer, click YES.
10. Computer will restart.

For updated drivers (including Windows 2000) visit our web site at http://www.bfgtech.com.

## V. Windows 2000/XP Installation Procedures

1. These drivers must be installed by a user with Windows 2000/XP Administrator privileges. Please consult your system administrator or Microsoft Windows 2000/XP User's Manual for more information on Administrator privileges.
2. Start Microsoft Windows 2000/XP.Insert driver CD.
3. From the Start menu, select Control Panel.
4. Select Performance and Maintenance.
5. Select System, then hardware.
6. Select Device Manager.
7. Under Display adapters, select the name of the NVIDIA adapter you have installed. If you do not see a Display adapters option, or if your NVIDIA adapter is not listed, under Other Devices, select Video Controller (VGA Compatible).
8. Select the Driver tab.

4

9. Select Update Driver.

10. Select Next.

11. Select Next.

12. Verify that "Specify a location" has a check mark next to it. If not, click in the box next to "Specify a location" to place a check mark in the box. Select Next.

13. Enter the path to the NVIDIA drivers in the "Copy manufacturer's files from:" dialog. Select OK.

14. If you get a dialog box that states "A suitable driver for this device is already installed", click in the box next to "Install one of the other drivers" to place a check mark in the box, then select Next. Otherwise, select Next, then proceed to step 16.

15. Select the following driver from the list. NVIDIA GeForce4 Ti 4600 is used an example; make sure to select your NVIDIA adapter from the list. Description Provider Manufacturer Location NVIDIA GeForce4 Ti 4600 NVIDIA a3tnv4_disp.inf Select Next.

16. Select Finish.

17. Select Close.

18. If Windows 2000/XP asks if you wish to restart the computer. Select Yes.

**Important! Verify Interrupt Assignment After Installing Drivers**

Your new Asylum graphics board needs a correct IRQ assignment for proper operation, otherwise it will not be detected when installing the drivers. Verify that your new card is assigned to an IRQ (preferably IRQ 11):

1. On your PC's desktop, right click on 'My Computer'.

2. Click 'Properties'.

3. Click 'Device Manager'.

4. Click 'Properties'.

5

5. Check to make sure your new card is assigned an IRQ (preferably #11). If it is not, refer to your motherboard manual or system manufacturer for help in reassigning IRQ #'s.

Asylum graphics accelerators should not share an IRQ with another device, EXCEPT "IRQ holder for PCI steering", or "ACPI IRQ holder for PCI steering"

**VI. Feature Guide"**



Direct 3D settings Tab                    6

6

11/08/02   FRI 16:53 FAX   7 934 4232   HARTFORD CREDIT   ☒011

Enable alternate depth buffering technique: Select this if you want to improve clarity in 16-bit color mode. There will be a slight reduction in overall performance.

Display logo when running Direct3D applications: User preference setting.

Mipmap levels: User selectable. Most people prefer '0'.

Auto-mipmap method: Bilinear improves performance a bit, 8-tap anisotropic filtering will produce better image quality.

More Direct 3D...

Texel Alignment: Leave at default.

PCI Texture Memory Size: Set to "0" if you have an AGP card. Leave at default if you have a PCI card. Most users have the AGP type.

Vertical sync: (Vsync) can prevent a tearing or "ripping" effect from occurring in certain games. Disabling will improve results when benchmarking, but may not prevent screen tears.

[8]

Enable fog table emulation: Leave disabled unless you are encountering display problems in certain games.

Adjust Z-buffer depth to rendering depth if unequal: Leave at default.

* You may or may not have all of the features shown in these examples.

[7]

## OpenGL Settings

**Enable buffer region extension:** Selecting this can improve performance in applications/games.

**Allow the dual planes region to use local video memory:** This selection can improve performance in applications/games. Do not select this unless you have enabled the above option.

**Use fast linear-mipmap-linear filtering:** Leaving this unselected can produce sharper image quality. Select this if you want to improve performance at the cost of image quality.

**Enable anisotropic filtering:** Select this for sharper image quality.

**Enable alternative depth buffering technique:** Selecting this will improve 16-bit image quality, but may reduce performance.

**Disable support for enhanced CPU instruction sets:** Leave this unselected.

[9]

**Default color depth for textures:** Set to preferred color depth. 16-bit color will give you more performance, while 32-bit will give you sharper images. "Desktop setting" will force the color of your Windows setting.

**Buffer flipping mode:** Leave at Auto-select.

**Vertical sync:** (Vsync) "On by default" setting can prevent a tearing or "rippling" effect from occurring in certain games. "Off by default" will improve results when benchmarking but may not prevent screen tears.

**Use up to "x" MB of system memory for textures in PCI mode:** Set to "0" if you have an AGP card. Leave at default if you have a PCI card. Most users have the AGP type.

## VII. Troubleshooting Tips

The following troubleshooting tips may help if you experience problems:

- Check that the card is seated properly in its expansion slot.
- Ensure that the display cable is securely fastened to the card's display connector.
- Make sure that the display and computer are plugged in and receiving power.
- If necessary, disable any built-in graphics capabilities on your motherboard. For more information, see your computer's manual.
- Make sure you selected the appropriate display device and graphics card when you installed the enhanced driver.
- For more troubleshooting tips, right-click the icon in the taskbar and select Troubleshooting.
- If you have problems during start-up, start your computer in Safe Mode.

Many of the tips in the following guidelines are designed for advanced users only. Exercising these options can have adverse effects on the current hardware configuration of your computer.

[10]

If you have limited computer experience, please contact someone with sufficient experience before applying these options or contact Asylum Tech-Support toll free at (866) BIG-FIXX (866-234-3499) 24 hours a day, 7 days a week, or online at support@rightech.com.

## A. System BIOS setup

Verify you have the latest BIOS available for motherboard.

In BIOS setup, set "Plug and Play OS" to YES and verify that the Asylum card has a dedicated IRQ (interrupt request) address assigned and no other devices are sharing the IRQ. If a device is sharing the IRQ, refer to your motherboard/computer manual or contact the computer manufacturer for help on resolving hardware conflicts in BIOS. It is possible to have multiple devices sharing the same IRQ, but for the sake of troubleshooting try assigning each device it's own IRQ.

Note: In some cases setting the "Plug and Play OS" to NO may benefit advanced users because this will allow you to manually assign memory addresses and IRQ's in BIOS setup and in Windows.

Verify you have an IRQ assigned for Display Adapter ("Assign IRQ for VGA") in BIOS setup (enter setup utility in BIOS and page through until you find a reference to this). It is common to find this in "PNP/PCI configuration", "peripheral devices", or "advanced CMOS setup" but may be located elsewhere. Not all motherboards have this option.

You may need to experiment with "AGP aperture" size in BIOS setup. Again, this setting can be found throughout the various BIOS setup pages.

## B. Operating system issues

Verify there are no hardware conflicts in Windows and that the graphic accelerator has assigned an IRQ address:

Win95/98 Click the Start button, Settings, and then Control Panel. Double-click the System Icon and then the Device Manager tab. No yellow exclamation marks should be present under Display Adapter. There should be an IRQ assigned for NVIDIA (your model; i.e. NVIDIA GeForce). If it says "standard display adapter", then the drivers are not loaded correctly or a conflict is occurring.

[11]

WinNT (You may need administrative rights to perform certain configuration changes in WinNT) Click the Start button, then Programs, Administrative Tools, Windows NT Diagnostics, and then Resources. There should be an IRQ assigned for NVx (i.e. NV4). If no NVx is present, then a conflict exists or driver is not loaded.

Note: Win 95/98/2000/XP and WinNT can have multiple devices shared on the same IRQ. If you notice this, identify the other device that is sharing resources with your Asylum graphic accelerator card. Verify that you have the software driver (installation program) for the device that is sharing an IRQ with our card and temporarily remove it physically. You may need to uninstall drivers for the device if your Asylum graphics accelerator card still does not come up properly. You may also need to reinstall drivers for our card at this point.

### To uninstall a device:

Win 95/98/2000/XP: Boot into Safe Mode by pressing the F8 button on your keyboard after the BIOS screen loads and just prior to observing the Win98 Splash screen. You will then see a boot menu appear. Choose Safe Mode and press Enter. Click the Start button, Settings, Control Panel, and then Add/Remove Programs. Locate the drivers for the device that is conflicting with your Asylum card. Highlight the software for the device on the list, then click the Add/Remove button. Reboot the computer in normal boot mode and do not add the drivers for device when prompted by Windows "New Hardware Found" dialogue box.

WinNT: Win NT already has a visible boot menu that appears every time you start up computer. From boot menu select VGA Mode, then allow NT to boot. Click the Start button, then Settings, Control Panel, and then Add/Remove Programs. Locate the drivers for the device that is conflicting with your Asylum card. Highlight the software for the device on the list, and click Add/Remove. Reboot the computer in normal boot mode.

Reinstalling the drivers for your Asylum graphics accelerator card again.

[12]

## C. Install latest chipset drivers

VIA: If you have a motherboard with a VIA chipset, you may need to install updated chipset drivers. VIA offers a "4-in-1" driver update for Win95/98/NT. Be sure to install the updated AGP drivers included in the "4-in-1" driver update. The AGP drivers are not supported in WinNT.

http://www.viaarena.com/?PageID=2

ALI: If you have a motherboard with an ALi chipset, you may need to install updated chipset drivers. ALi offers an updated AGP driver for Win95 OSR2 and Win98/98SE specifically for your chipset. For more information regarding which version is best for you, contact your dealer or manufacturer of motherboard for the appropriate version. In most cases, the most recent driver available is preferable. The AGP drivers are not supported in WinNT.

http://www.ali.com.tw/eng/support/drivers.html

SIS: If you have a motherboard with a SIS chipset, you many need to install updated chipset drivers. SIS offers updated AGP drivers for specific chipsets. The drivers can be found at:

http://www.sis.com.tw/support/utility.htm

AMD: AMD Athlon users are encouraged to download the AGP miniport driver (4.45 or later) for motherboards using AMD-751 system controller (Northbridge):

http://www.amd.com/products/cpg/bin/

## D. Install latest drivers for Asylum Graphics Accelerator

There are multiple versions of drivers for our cards. Some versions have an executable program (setup.exe) which will install drivers for you automatically and update the registry. Other versions are self-extracting Zip files, which unzip the contents of the file into a directory. BFG Tech recommends referring to the "readme.txt" or "manual.pdf" file associated with your CD or downloaded Zip file for installation instructions.

13

Updated drivers can offer increased stability, improved compatibility, user selectable tweaks/settings, and improved performance. The latest software driver updates are available on BFG Tech's web site: http://www.bfgtech.com/support. In most cases, a driver upgrade can be performed by installing newer drivers which will update and overwrite existing driver files.

Before performing a driver update, we recommend that you identify your existing driver version:

Win95/98/2000/XP: Click the Start button, go to Settings, Control Panel, System, and then the Device Manager tab. Double-click Display Adapter, right click on the NVIDIA card, and select Properties from the menu. Click the tab Driver, and then the Driver File Details button. Observe the file version and document version.

WinNT: Click the Start button, go to Settings, Control Panel, Display, Settings, and finally Display Type. Document the "version number" under Driver Information.

In some cases, the existing drivers must be removed and the new driver installed "clean."

To remove existing drivers, run Windows uninstall program as previously mentioned.

**Note:** If uninstall program generates an error message stating that it cannot find a file then your existing drivers are corrupt and must be reinstalled with the same version of driver or higher before attempting uninstall program again.

14

## E. Resolution/Color depth issues

If your monitor does not respond with an appropriate EDID from a DDC request then the drivers for the graphic accelerators will not be able to detect the monitor type and you will be limited to VGA 640x480 resolution, although you should still be able to go beyond 16 colors. This problem can occur after loading the drivers for the first time or after upgrading previously installed drivers. If you installed the drivers for the first time while your system was in 16-color mode, you will need to reboot the computer before attempting to change settings.

If the display adapter type says "NVIDIA" (i.e NVIDIA GeForce DDR) after installing the drivers, but you cannot increase the color beyond 256, then you must assign/reassign a monitor type.

To identify your monitor type:

Win95/98/2000 choose the Start button, go to Settings, Control Panel, and double-click the Display icon. Click the Settings tab, the Advanced button, and then the Monitor tab. "Unknown monitor" type in Win95/98 can prevent you from changing resolutions and color depths.

To resolve problems associated with monitor type selection:

1. Verify "Automatically detect plug and play monitor" is selected in Monitor tab. You will need to reboot for changes to take effect. If Windows does not assign a monitor type other than "unknown monitor" by assigning one manually.

2. To assign manually, click the Change button. Newer OS's have more monitor types available than older ones. If your monitor is not present, you may be able to find one that is close. If you can't find a specific Sony 17" monitor, try the other Sony 17" monitor types until you find one that can produce a desirable display (ie. NVIDIA can also experiment with standard monitor types (i.e. standard 1024x768@75Hz). To show the complete list of monitor types available under Win98, click the "Show all hardware" button. The list on the left gives you manufacturers, while the list on the right gives you monitors that you can choose manually.

Note: If you cannot go beyond 16 colors then the drivers are not installed properly or a hardware conflict exists (see page 2 about IRQ assignments

15

## F. Resolving Computer lock-ups

### General Windows lock-ups

1. Hardware lockups - (see page 2 about IRQ assignments)

2. Remove previous video card drivers:
   Run uninstall program for previous video card drivers, then reinstall latest drivers for Asylum graphics accelerator. You may need to boot into safe mode to uninstall the drivers for the Asylum card and your old card and then perform a "clean install" with latest drivers posted on our web site.

3. Win95/98 with ALI chipset:
   Go to regedit (advanced users only) HKEY_LOCAL_MACHINE, Software, Ali, AGP, then change value of frame buffer size from 0 to 10.

4. As mentioned earlier, make sure you have latest BIOS for motherboard, latest AGP drivers for chipset, and latest drivers for Asylum graphics accelerator.

5. Refrain from over-clocking the CPU, graphics accelerator, or any other hardware device. BFG Tech does not support any over-clocking of our products.

6. The Asylum graphic accelerators powered by NVIDIA's GeForce chip require a power supply of 250W or higher.

7. Your motherboard must be capable of providing adequate voltage to the AGP card. The AGP 2.0 specification requires 6A at 3.3V for the AGP socket and 2A at 5.0V for the AGP socket. The Asylum GeForce will consume up to 6A at 3.3V and 2A at 5.0V when running video intensive applications such as 3D games.

8. This next tip is from the NVIDIA newsgroup:
   "alt.comp.periphals.videocards.NVIDIA" can help resolve lock-ups on Super Socket 7 motherboards:

   In Win95/98 go to Start Button, Settings, Control Panel, System, Device Manager, System Devices, PCI Bus, then select Properties, go into Settings tab and set Device enumeration to "Use Hardware settings" Now click the IRQ steering tab and uncheck "Get IRQ" table using ACPI BIOS. Click OK and reboot for changes to take.

16

## Game specific lock-ups

1. The drivers currently offered on our web site for our graphic accelerators do not support Glide. Glide is a proprietary API. Open GL and Direct-X is supported by these drivers.

2. Contact the video game manufacturer for updates or patches to resolve problems. You may also review the web site of the game manufacturer for possible FAQ's or troubleshooting tips. These tips are often found in the "tech support" or "support" section of their web site.

3. Try to reduce hardware acceleration. From Start Button go to Settings, Control Panel, Display, Settings, Advanced, Performance, then reduce the level of hardware acceleration until desirable results are achieved.

## Appendix A. VCCI

This is a Class B product, to be used in a domestic environment, based on the Technical Requirement of the Voluntary Control Council for Interference from Information Technology Equipment (VCCI). If this is used near a radio or

television receiver in a domestic environment, it may cause radio interference. Please install and use the equipment according to the instruction manual.

## AFFIDAVIT OF SERVICE

The undersigned, a non-attorney, hereby states under oath that she caused to be served

true and correct copies of the foregoing Notice of Filing and the document referred to therein

upon all parties on the attached service list by first class mail, this 22nd day of July, 2003.

_____
Bernadette Panovich

Subscribed and sworn before me
this 22nd day of July, 2003.

"OFFICIAL SEAL"
LILLIAN A ASKEW
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 06/22/07

_____
Notary Public